AMERICAN FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES v CITY OF DETROIT

Docket No. 253592. Submitted March 15, 2005, at Detroit. Decided July
5, 2005, at 9:00 a.m. Leave to appeal sought.

The American Federation of State, County and Municipal Employees
(AFSCME) Michigan Council 25 and others brought an action in
the Wayne Circuit Court against the city of Detroit, the mayor of
Detroit, the Wayne County Executive, the Macomb County Board
of Commissioners Chairperson, the Oakland County Executive,
the Regional Transit Coordinating Council, and the Suburban
Mobility Authority for Regional Transportation (SMART), seeking
to preclude the transfer of authority from the Regional Transit
Coordinating Council (RTCC), a statutorily created funding and
transportation coordinating entity, to the Detroit Area Regional
Transportation Authority (DARTA), a transit system comprised of
the RTCC and SMART. The court, James J. Rashid, J., ruled that
the RTCC cannot transfer its powers to DARTA, but did not
declare as null and void the agreement that created and governs
DARTA because of the severability provisions of that agreement.
The defendants appealed and the plaintiffs cross-appealed.

The Court of Appeals *held*:

1. The authority given to the RTCC, whose members are the
chief executive officers of Detroit and the defendant counties,
consists of acting as a funding conduit. The circuit court was
correct that MCL 124.404a(3) does not provide for participation by
the RTCC in DARTA. The Legislature, in enacting the Metropoli-
tan Transportation Authorities Act, MCL 124.401 *et seq.*, chose to
provide different grants of authorities to entities depending on
whether they were formed by the votes of county boards of
commissioners or by city and county chief executive officers, the
latter of which had a more limited scope of authority. The RTCC,
by entering into the DARTA agreement, lost its essence, if not its
existence, in transferring its funding capacity to DARTA. DARTA,
with its expanded board, eliminated the statutory requirement of
unanimity in decision making that applies to the RTCC and
improperly allowed it to act as a general authority.

2. The circuit court erred in not declaring the DARTA agreement null and void. Because the addition of the RTCC was central to the DARTA agreement, severing the RTCC provisions from the DARTA agreement and maintaining the DARTA agreement without the RTCC provisions is inappropriate.

Affirmed in part and reversed in part.

1. MASS TRANSPORTATION — REGIONAL TRANSIT COORDINATING COUNCILS — METROPOLITAN TRANSPORTATION AUTHORITIES.

The authority of a regional transit coordinating council to receive transportation operating and capital assistance grants may not be transferred to a metropolitan transportation authority (MCL 125.404, 125.404a).

2. CONTRACTS — SEVERABILITY — ILLEGAL PROVISIONS.

Illegal portions of a contractual agreement may be severed only if the illegal provisions are not central to the parties' agreement.

*Martens, Ice, Klass, Legghio & Israel, P.C.* (by *Renate Klass*), for American Federation of State, County and Municipal Employees Michigan Council 25, AFSCME Local 312, AFSCME Local 214 and Leamon Wilson.

*Bellanca, Beattie & De Lisle, PC* (by *James C. Zeman*), for the city of Detroit and the mayor of the city of Detroit.

Wayne County Corporation Counsel (by *Azzam E. Elder* and *Nancy Rade*) for the Wayne County Executive.

*Miller, Canfield, Paddock and Stone, PLC* (by *Joseph F. Galvin, Michael P. McGee,* and *Matthew P. Allen*), for the Regional Transit Coordinating Council, the Macomb County Board of Commissioners Chairperson, and the Oakland County Executive.

*Avery E. Gordon* and *Zausmer, Kaufman, August & Caldwell, PC* (by *Mark J. Zausmer*), for the Suburban Mobility Authority for Regional Transportation.

Before: FORT HOOD, P.J., and GRIFFIN and DONOFRIO, JJ.

PER CURIAM. This litigation arises out of an attempt by the leaders of three counties in the Metropolitan Detroit area, acting in concert with the mayor of the city of Detroit, to create a transit system entitled Detroit Area Regional Transportation Authority (DARTA) to serve the tri-county area. Plaintiff labor unions and individual plaintiff Leamon Wilson (plaintiffs)[1] filed a complaint challenging the creation of DARTA. Plaintiffs named the corporate entities that comprised DARTA as defendants: the Regional Transit Coordinating Council (RTCC), an entity created by statute to collect funds and coordinate transit services; and Suburban Mobility Authority for Regional Transportation (SMART), the current operating transit system. Plaintiffs also named the leaders of the counties involved in the creation of DARTA, the Oakland County Executive, the Wayne County Executive, the chairperson of the Macomb County Board of Commissioners, and the mayor of the city of Detroit. After entertaining oral argument on the cross-motions for summary disposition on multiple occasions and after ordering supplemental briefing, the trial court essentially concluded that the RTCC did not have the authority to participate in DARTA and that any involvement with DARTA was effectively invalidated. However, the trial court declined the invitation to declare the entire DARTA agreement null and void. We affirm the trial court's conclusion that the RTCC was not entitled to transfer its powers to DARTA, and we reverse the trial

---

[1] Although plaintiff unions represented the employees of the Detroit transit system, known as D-DOT, Detroit Department of Transportation, plaintiff unions did not name D-DOT as a defendant.

court's conclusion that the DARTA agreement could be severed.

On January 12, 1989, the mayor of the city of Detroit, the chairperson of the Macomb County Board of Commissioners, the Oakland County Executive, and the Wayne County Executive adopted articles of incorporation for the Regional Transit Coordinating Council premised on the statutory authority found in MCL 124.404a. The articles of incorporation provided that the purposes of the RTCC were: (a) to establish and direct public transportation policy within its designated area; (b) to apply for and distribute grants; (c) to adopt transportation plans and coordinate service functions; and (d) to conduct all activities and exercise all powers *authorized by the act*. Article IV provided that each member of the RTCC shall have one vote in all matters before the council, and any action was to occur by unanimous vote of all four members. Additionally, a council member could not designate another representative to serve in his or her place on the council.

In the spring of 2003, the RTCC, SMART, and the city of Detroit proposed an interlocal and intergovernmental agreement designed to create DARTA, the Detroit Area Regional Transportation Authority, a Michigan public body corporate. The agreement proposed that the parties utilize existing constitutional and statutory law to establish more effective and efficient public transportation services. The agreement provided, in relevant part:

> Under this agreement the Parties agree to transfer to DARTA such existing powers, duties, functions, responsibilities and authority possessed by one or more of the Parties believed essential to the provision of quality public transportation services.

Under this agreement DARTA may not and shall not levy taxes and DARTA may not and shall not bind any unit of state, county, city, township or village government to any obligation without the express consent of the individual unit.

Although the articles of incorporation of the RTCC provided for four members, each receiving an individual vote to make unanimous decisions, the DARTA agreement modified the manner in which the authority's board would operate. The DARTA agreement provided that additional board members would be appointed by the original four executives and would operate by majority vote. The authority's board also was responsible for the selection and retention of a chief executive officer. Moreover, there was no indication that the RTCC would continue to exist upon execution of the DARTA agreement. This agreement provided that the RTCC would transfer "any other authority, powers, duties, functions and responsibilities of the RTCC necessary to implement this Agreement."

Plaintiffs filed suit to preclude the transfer of authority by the RTCC to DARTA. It was alleged that defendant RTCC lacked the authority to enter into an interlocal agreement based on the Urban Cooperation Act (UCA), MCL 124.501 *et seq.*, because the RTCC was not a public agency for the purposes of the UCA. Additionally, plaintiffs alleged that DARTA was not formed in compliance with the intergovernmental transfers of functions and responsibilities act (ITFRA), MCL 124.531 *et seq.*, because the RTCC was not a political subdivision as contemplated by that statute.[2] Because the transfer of authority of the RTCC was not appropriate, plaintiffs alleged that the RTCC could not trans-

---

[2] There were additional allegations in the complaint. However, the parties agree that these challenges are the only two raised on appeal.

fer its functions to DARTA. The trial court agreed and denied defendants' motion for summary disposition. However, on the basis of severability provisions contained in the agreement, the trial court rejected plaintiffs' further assertion that the entire DARTA agreement was null and void.

This litigation requires us to apply the rules of statutory construction, the standard for granting summary disposition, and the rules of contract construction. Issues of statutory construction present questions of law that are reviewed de novo. *Cruz v State Farm Mut Auto Ins Co*, 466 Mich 588, 594; 648 NW2d 591 (2002). The goal of statutory construction is to discern and give effect to the intent of the Legislature by examining the most reliable evidence of its intent—the words of the statute. *Neal v Wilkes*, 470 Mich 661, 665; 685 NW2d 648 (2004). If the statutory language is unambiguous, appellate courts presume that the Legislature intended the plainly expressed meaning, and further judicial construction is neither permitted nor required. *DiBenedetto v West Shore Hosp*, 461 Mich 394, 402; 605 NW2d 300 (2000). Under the plain meaning rule, "courts should give the ordinary and accepted meaning to the mandatory word 'shall' and the permissive word 'may' unless to do so would frustrate the legislative intent as evidenced by other statutory language or by reading the statute as a whole." *Browder v Int'l Fidelity Ins Co*, 413 Mich 603, 612; 321 NW2d 668 (1982). Michigan recognizes the maxim "*expressio unius est exclusio alterius*; that the express mention in a statute of one thing implies the exclusion of other similar things." *Bradley v Saranac Community Schools Bd of Ed*, 455 Mich 285, 298; 565 NW2d 650 (1997). However, "this maxim is merely an aid to interpreting legislative intent and cannot govern if the result would defeat the clear legislative intent . . . ." *Grand Rapids Employees Inde-*

*pendent Union v Grand Rapids,* 235 Mich App 398, 406; 597 NW2d 284 (1999). The legislative history of an act may be examined "to ascertain the reason for the act and the meaning of its provisions." *DeVormer v De-Vormer,* 240 Mich App 601, 607; 618 NW2d 39 (2000). Legislative history is valuable when it evidences a legislative intent to repudiate a judicial construction or considers alternatives in statutory language. *In re Certified Question (Kenneth Henes Special Projects v Continental Biomass Industries, Inc),* 468 Mich 109, 115 n 5; 659 NW2d 597 (2003). However, legislative history is afforded little significance when it is not an official view of the legislators and cannot be utilized to create an ambiguity where one does not otherwise exist. *Id.*

We review de novo summary disposition decisions. *In re Capuzzi Estate,* 470 Mich 399, 402; 684 NW2d 677 (2004). The moving party has the initial burden to support its claim for summary disposition under MCR 2.116(C)(7) or (10) by affidavits, depositions, admissions, or other documentary evidence. *Quinto v Cross & Peters Co,* 451 Mich 358, 362; 547 NW2d 314 (1996). The burden then shifts to the nonmoving party to demonstrate that a genuine issue of disputed fact exists for trial. *Id.* To meet this burden, the nonmoving party must present documentary evidence establishing the existence of a material fact, and the motion is properly granted if this burden is not satisfied. *Id.* Affidavits, depositions, and documentary evidence offered in support of, and in opposition to, a dispositive motion shall be considered only to the extent that the content or substance would be admissible as evidence. *Maiden v Rozwood,* 461 Mich 109, 119; 597 NW2d 817 (1999).

The construction and interpretation of a contract presents a question of law that is reviewed de novo. *Bandit Industries, Inc v Hobbs Int'l Inc (After Remand),*

463 Mich 504, 511; 620 NW2d 531 (2001). The goal of contract construction is to determine and enforce the parties' intent on the basis of the plain language of the contract itself. *Old Kent Bank v Sobczak*, 243 Mich App 57, 63; 620 NW2d 663 (2000). " 'If the contract language is clear and unambiguous, its meaning presents a question of law' " for the courts to determine. *UAW-GM Human Resource Ctr v KSL Recreation Corp*, 228 Mich App 486, 491; 579 NW2d 411 (1998) (citations deleted). Illegal portions of a contractual agreement may be severed. *Stokes v Millen Roofing Co*, 466 Mich 660, 666; 649 NW2d 371 (2002). However, in order to sever "the illegal portion, the illegal provision must not be central to the parties' agreement." *Id.* "If the agreements are interdependent and the parties would not have entered into one in the absence of the other, the contract will be regarded . . . as entire and not divisible." *Id.*, quoting 3 Williston, Contracts (3d ed), § 532, p 765.

The Metropolitan Transportation Authorities Act of 1967 (MTAA), MCL 124.401 *et seq.*, commences with the following title:

> An act to create metropolitan transportation authorities; to define their powers and duties, including the creation of transportation districts; to provide for the withdrawal of counties from the authorities; to require the state to guarantee payment of certain claims against certain transportation authorities and to give the state a lien in satisfaction of payment, to permit the creation of certain councils; and to prescribe penalties and provide remedies.

MCL 124.402 sets forth the definitions to be applied:

> As used in this act:
>
> (a) "Authority" means an authority created by or pursuant to this act.
>
> (b) "Board" means the governing and administrative body of an authority.

(c) "Chief executive officer" means, with respect to a city, the mayor of the city and, with respect to a county, either the county executive of the county or, for a county not having a county executive, the chairperson of the county board of commissioners.

(d) "Constituent unit" means each of the counties comprising a part of an authority or a council and each city having a population of 750,000 or more within such a county.

(e) "Council" means a regional transit coordinating council formed pursuant to section 4a.

(f) "Governor" means the governor of the state.

(g) "Metropolitan area" means an area conforming in general to a consolidated metropolitan statistical area as defined by the United States office of management and budget or 2 or more counties which form a generally recognized urban complex. However, for the purposes of this act, Lapeer county shall not be considered part of a consolidated metropolitan statistical area.

(h) "Public transportation facility" means all property, real and personal, public or private, so long as used or useful for general or special transportation service to the public, including, but not limited to, street railways, motor bus [sic], tramlines, subways, monorails, rail rapid transit, and the movement of people thereby together with tunnel, bridge, and parking facilities used in connection with these transportation services of the authority, but shall not include taxis, limousines, highways, ports, airports, charter or sightseeing services, or transportation which is exclusively used for school purposes.

MCL 124.403 sets forth the powers of authorities:

Authorities created under this act shall plan, acquire, construct, operate, maintain, replace, improve, extend and contract for public transportation facilities. An authority is a public benefit agency and instrumentality of the state with all the powers of a public corporation, for the purpose of planning, acquiring, constructing, operating, maintaining, improving and extending public transportation facili-

ties, and for controlling, operating, administering and exercising the franchise of such transportation facilities, if any, including charter operations as acquired.

MCL 124.404 provides for the establishment of authorities and withdrawal therefrom:

(1) Regional transportation authorities in major metropolitan areas of the state may be established as 1 or more contiguous counties elect by majority vote of the county boards of commissioners to establish or participate in an authority.

(2) A county which becomes a part of an authority created under this act may withdraw from the authority within 1 year after the county becomes a part of the authority by a resolution of withdrawal approved by a majority vote of the members elected to and serving on its county board of commissioners or may withdraw at any time after 1 year after the county becomes a part of the authority by a resolution of withdrawal approved by a 2/3 vote of the members elected to and serving on its county board of commissioners. However, if the county has an elected county executive pursuant to Act No. 139 of the Public Acts of 1973, as amended, being sections 45.551 to 45.573 of the Michigan Compiled Laws, the county executive may veto the resolution. A veto may be overridden by a 2/3 vote of the members elected to and serving on the county board of commissioners.

On the basis of the plain language of the statute, see *Neal, supra*, the Legislature, by enacting the MTAA, provided for the creation of metropolitan transportation authorities, entities designed to provide transportation to cooperating districts. Moreover, an authority created by MCL 124.403 was entitled to engage in all foundational elements required for operation of public transportation facilities. To establish a regional transportation authority, a majority vote of the county board(s) of commissioners as established by one or more

contiguous counties would agree to participate in such an authority.

In the present case, a vote by a majority of the county boards of commissioners did not occur. Rather, this dispute is derived from the interpretation of MCL 124.404a. This statute provides for the creation of the RTCC, and sets forth its purpose as well as its rights, duties, and powers:

(1) The chief executive officer of each city having a population of 750,000 or more within a metropolitan area, of each county in which such a city is located, and of all other counties immediately contiguous to such a city shall form a corporation, subject to the limitations of this act, to be known as the regional transit coordinating council for the purpose of establishing and directing public transportation policy within a metropolitan area. The counties of Livingston, Monroe, St. Clair, and Washtenaw shall be collectively represented on the council by 1 member, without vote, from 1 of the counties and shall determine their representative member on the council in a manner to be determined by the counties. The county from which the representative member is to be selected shall rotate among the counties at least every 2 years and the member shall be a resident of the county from which the member is to be selected. If 1 or more of the counties of Livingston, Monroe, St. Clair, and Washtenaw withdraw from the authority, the member shall rotate between, and be selected from, the remaining counties.

(2) *A council formed under this section shall be considered an authority organized pursuant to this act for the sole purpose of receiving transportation operating and capital assistance grants. A council may not exercise any rights, duties, or powers provided to an authority organized pursuant to this act except as is necessary to receive transportation operating and capital assistance grants.*

(3) *The council may adopt public transportation plans for its metropolitan area. The council shall coordinate*

*service overlap, rates, routing, scheduling, and like func-
tions between operators of public transportation. The coun-
cil shall not have power to employ operating personnel,
negotiate collective bargaining agreements with operating
personnel, or own operating assets of a public transporta-
tion service within the metropolitan area.*

(4) The articles of incorporation forming the council
shall provide for the conduct of the affairs of the council,
including provision for the appointment of a general sec-
retary to the council and the allocation between the city
and any authority representing the counties of any grants
applied for by the council.

(5) The council shall be a "designated recipient" for
purposes of the former federal urban mass transportation
act of 1964, Public Law 88-365, and the regulations pro-
mulgated under that act, to apply for federal and state
transportation operating and capital assistance grants, but
the council may designate a city with a population of more
than 750,000 and the authority representing the counties
each as a subrecipient of federal and state transportation
funds. To the extent required by the federal urban mass
transportation act of 1964 and the regulations thereunder,
the council and a city with a population over 750,000 and
the authority representing the counties shall execute a
supplemental agreement conferring on a city with a popu-
lation over 750,000 and the authority representing the
counties the right to receive and dispense grant funds and
containing such other provisions as are required by federal
law and regulation. The general secretary shall submit in a
timely manner the council's application for such funds to
the responsible federal and state agencies. The application
shall designate the distribution of all capital and operating
funds which shall be paid directly to a city with a popula-
tion over 750,000 and the authority representing the
counties. If the council is the recipient, the general secre-
tary, as soon as possible, but not more than 10 business
days after receipt of the funds by the general secretary,
shall remit to a city with a population over 750,000 and the
authority representing the counties their designated distri-
bution of the funds.

(6) The council shall act by a unanimous vote of its membership entitled to vote and shall meet regularly but not less than quarterly. A council member shall not designate another representative to serve in his or her place on the council.

(7) The business which the council may perform shall be conducted at a public meeting of the council held in compliance with the open meetings act, 1976 PA 267, MCL 15.261 to 15.275. Public notice of the time, date, and place of the meeting shall be given in the manner required by the open meetings act, 1976 PA 267, MCL 15.261 to 15.275.

(8) An advisory committee comprised of riders who are senior citizens or persons with disabilities, or both, and who live within the southeastern Michigan transportation authority shall be established and shall report their concerns to the council on a regularly scheduled basis.

(9) Before any state or federal funds are distributed to any of the eligible authorities or eligible governmental agencies coordinated by the council, a financial audit of the transit operations for the fiscal year immediately previous to the most recently completed fiscal year shall be provided to the state transportation department in accordance with section 10h(2) of 1951 PA 51, MCL 247.660h. The state transportation department may waive this requirement on a temporary basis. Each audit shall be in accordance with sections 6 to 13 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.426 to 141.433. Each financial audit shall also be in accordance with generally accepted accounting standards as promulgated by the United States general accounting office and shall satisfy federal regulations relating to federal grant compliance audit requirements. [MCL 124.404a (emphasis added).]

Thus, the MTAA provides that, to form a regional transit coordinating council, the chief executive officer of a city with a population of 750,000 or more shall form a corporation, subject to the limitations of the act, with counties immediately contiguous to the city. The corporation is to be known as the regional transit coordinat-

ing council or RTCC. MCL 124.404a. There is no dispute that the city of Detroit satisfies the population requirement, and there is no dispute regarding the contiguous counties participating in the RTCC.

The parties' principal dispute arises from the interpretation of MCL 124.404a(2) as read in conjunction with MCL 124.404a(3). MCL 124.404a(2) provides that the RTCC formed under this section "shall be considered an authority organized pursuant to this act for the sole purpose of receiving transportation operating and capital assistance grants. A council may not exercise any rights, duties, or powers provided to an authority organized pursuant to this act except as is necessary[3] to receive transportation operating and capital assistance grants."

Although MCL 124.404a(2) provides that the council may not exercise rights, duties, or powers provided to an authority, the subsection immediately following, MCL 124.404a(3), provides that the "council shall coordinate service overlap, rates, routing, scheduling, and like functions between operators of public transportation. The council shall not have the power to employ operating personnel, negotiate collective bargaining agreements with operating personnel, or own operating assets of a public transportation service within the metropolitan area."

Plaintiffs alleged, and the trial court agreed, that defendants were limited by the language of MCL 124.404a(2). Therefore, the RTCC could not enter into the interlocal or intergovernmental agreement that created DARTA because it was only entitled to receive transportation operating and capital assistance grants.

---

[3] Blanket assertions regarding necessity do not entitle a party to summary disposition. *Quinto, supra.* Consequently, defendants' argument, that the necessity requirement was established, is without merit.

However, defendants asserted that the two subsections must be read in harmony because they appeared within the same statute, and the UCA and ITFRA provide the foundation for the RTCC's participation in DARTA. We disagree.

"It is a well-established rule of statutory construction that provisions of a statute must be construed in light of the other provisions of the statute to carry out the apparent purpose of the Legislature." *Farrington v Total Petroleum, Inc*, 442 Mich 201, 209; 501 NW2d 76 (1993). The Legislature is presumed to be aware of existing law; therefore, we do not assume that the Legislature inadvertently omitted from one statute the language that is placed in another statute. *Id.* at 210. Provisions must be read in the context of the entire statute to produce a harmonious whole. *Macomb Co Prosecuting Attorney v Murphy*, 464 Mich 149, 159; 627 NW2d 247 (2001). Two statutes that relate to the same subject or share a common purpose are *in pari materia* and must be read together. *People v Webb*, 458 Mich 265, 274; 580 NW2d 884 (1998). The goal of the *in pari materia* rule is to give effect to the legislative purpose found in the harmonious statutes. *Id.* When two statutes lend themselves to a construction that avoids conflict, that construction should control. *Id.*

On the basis of the plain language of the MTAA, see *Neal, supra*, a contiguous county may establish a transportation authority upon majority vote of the county board of commissioners. MCL 124.404, and the authority is entitled to engage in activity designed to establish the facilities for operation of a transit system. MCL 124.403. However, in the context of the RTCC, where the council is comprised of chief executives who act on unanimous vote, MCL 124.404a(6), the council itself "shall be considered an authority pursuant to this act

for the sole purpose of receiving transportation operating and capital assistance grants. A council may not exercise any rights, duties, or powers provided to an authority organized pursuant to this act except as is necessary to receive transportation operating and capital assistance grants." MCL 124.404a(2). Thus, the authority given to a transportation body comprised of chief executives is severely limited to acting as a funding conduit.

Defendants cite the powers provided to the RTCC as set forth in MCL 124.404a(3). MCL 124.404a(3) provides:

> The council may adopt public transportation plans for its metropolitan area. The council shall coordinate service overlap rates, routing, scheduling, and like functions between operators of public transportation. The council shall not have the power to employ operating personnel, negotiate collective bargaining agreements with operating personnel, or own operating assets of a public transportation service within the metropolitan area.

The plain language of MCL 124.404a(3) does not provide for the RTCC's participation in DARTA. The Legislature, in enacting the MTAA, chose to provide different grants of authorization to entities that were created by the majority vote of a county board as opposed to the authorization granted to an entity formed on the basis of the unanimous vote of county executives. The RTCC, as adopted on the basis of the consent of county executives, is limited to acting as a funding conduit. Although it is given the additional option of adopting transportation plans,[4] its function is to ensure that service is coordinated *among operators of public trans-*

---

[4] The statute uses the permissive term "may" with regard to adoption of transportation plans. Thus, the RTCC is not obligated to adopt a transportation plan. See *Browder, supra.*

*portation*. Thus, the plain language of the MTAA indicates that transportation plans that are adopted through the majority vote of a county board of commissioners are granted under authority with regard to the establishment of a transit system. MCL 124.404. However, in the context of an authority established by county executives, the authorization is limited. MCL 124.404a. The limitation on the power of the executives acts as a form of checks and balances.

Defendants allege that the RTCC may enter into the DARTA agreement on the basis of the UCA and ITFRA. We disagree. MCL 124.504 of the UCA provides for the joint exercise of powers by public agencies of this state[5] for "any power, privilege, or authority that the agencies share in common and that each might exercise separately." The RTCC lost its essence, if not its existence, by entering into DARTA. Pursuant to the DARTA agreement, the RTCC, a funding conduit and potentially merely a coordinator of a transportation plan, transferred its funding capacity to DARTA. DARTA then modified all the terms of the RTCC as provided in MCL 124.404a. The RTCC proceeded from an entity governed by four members acting unanimously to an eleven-member board that was appointed by RTCC members and that acted by quorum. Thus, DARTA eliminates the qualifications placed on the RTCC's existence by statute and effectively allows it to act as a general authority as set forth in the MTAA. MCL 124.403, 124.404. Defendants cannot employ the UCA to alter the status of the RTCC from its limited authority. See *Macomb Co Prosecuting Attorney, supra*. The limited authority granted the RTCC implies a system of checks and balances by placing boundaries on the

---

[5] We assume, without deciding, that the entities executing the DARTA agreement qualify as public agencies of the state.

activities of the four members who must act unanimously. The transfer of authority from the RTCC to DARTA eliminates the checks and balances on the RTCC by lifting those limitations.

Moreover, ITFRA provides that two or more political subdivisions[6] may enter into a contract that provides for "the transfer of functions or responsibilities." MCL 124.532. The plain language of the statute provides for the transfer of functions or responsibilities, and it does not provide that the transfer of functions may encompass material changes or alteration of functions.[7] *Neal, supra*; *Farrington, supra*.[8] In the present case, the RTCC did not merely transfer its funding responsibilities and its limited decision-making power. The RTCC transferred its functions and materially altered the manner in which decisions would be made from four unanimous members to a quorum of appointees selected by the original RTCC board. Consequently, ITFRA cannot be utilized to assert that a mere transfer of the RTCC's functions occurred. The plain language of the statute does not allow for material changes to the transfer of functions. *Neal, supra*.

Lastly, we conclude that the trial court erred in failing to declare the DARTA agreement null and void because of its severability provisions. To sever an illegal

---

[6] We assume, without deciding, that the political subdivision criterion is satisfied.

[7] The challenge based on Const 1963, art 7, § 28 likewise fails because the statute allows transfers of the functions or powers that each could perform separately and does not provide for an expansion of power.

[8] Our analysis is based on the plain language of the statutes at issue. Both parties argue over the import of the submission of the House Legislative Analysis Report addressing the effect of a statute reorganizing the Southeastern Michigan Transportation Authority (SEMTA) bus service. This report is unnecessary in light of the plain language of the statute, see *Neal, supra*, and is afforded little significance because it is not an official view of the legislators, see *In re Certified Question, supra*.

portion, the illegal provision must not be central to the parties' agreement. *Stokes, supra.* In the present case, the addition of RTCC was central to the parties' agreement. The RTCC transferred its fund-gathering authority to DARTA. However, the RTCC also changed the operating mechanism. The governing board was changed from four unanimously voting members to action based on a quorum of eleven members, many of whom were appointed by the original four board members. Because the RTCC board not only supplied the funding mechanism but also determined how DARTA would engage in decision making by a newly selected and expanded body, severability is inappropriate.

Affirmed in part and reversed in part. We do not retain jurisdiction.