# STATE OF MICHIGAN

# COURT OF APPEALS

NORTHERN MICHIGAN ENVIRONMENTAL
ACTION COUNCIL and PRISCILLA
TOWNSEND,

        Appellees,

v

CITY OF TRAVERSE CITY,

        Other Party,

and

PINE STREET DEVELOPMENT ONE, LLC,

        Intervening Appellant.

UNPUBLISHED
October 24, 2017

No. 332590
Grand Traverse Circuit Court
LC No. 2015-031341-AA

Before: SAWYER, P.J., and MURRAY and GLEICHER, JJ.

PER CURIAM.

Intervening Appellant Pine Street Development One ("Pine Street") appeals from an order of the circuit court vacating a special land use permit issued by the City of Traverse City and remanding the matter to the city's planning commission for further proceedings. We affirm.

Pine Street applied for a special land use permit (SLUP) to construct two 96-foot tall buildings in downtown Traverse City that would include apartments and commercial space. The SLUP was necessary because the building height exceeds 60 feet. Following a public meeting, the planning commission granted the SLUP. Appellees filed suit against the city in circuit court challenging the SLUP. Pine Street intervened because of its interest in the project.

The court delivered an opinion from the bench which focused on Traverse City ordinance standards 1364.02(c) and (d), which require that a special use will be served adequately by existing public facilities and services and shall not create excessive additional requirements at public cost for facilities and services. The court explained that the city commission incorporated by reference a staff report stating "in conclusory terms that the proposed development will be adequately served by existing public infrastructure and services, but notes that street

-1-

improvements will be made." The court opined that "[t]he notion that two 9-story buildings can be constructed with 162 residences and related parking and commercial space and not have any marginal impact on infrastructure, facilities, or services is absurd." Although the city commission asserted that "[t]he project will bring additional tax revenue which will provide for additional infrastructure, facilities and services, including through TIF[1] and Brownfield[2] programs[,]" the court held that "[t]he record is bereft of any documents, staff report or commission comment describing the source of the TIF funds, the amounts diverted from general tax revenues annually and the time period the diversion will last." The court expressed that it was "almost unbelievabl[e]" that the staff report adopted by the city commission referenced TIF funds as a source of revenue offsetting the cost of increased municipal services when TIF funds are local tax dollars diverted for the developer's benefit. According to the court, the factual finding that the development would bring in additional tax revenue "other than in an undefined and distant future" was "categorically false," because the tax revenue would be returned to the developer through TIF and Brownfield funds to pay for its costs and to remediate the polluted development site. The court opined that by approving the SLUP, the city commission was either "hopelessly naïve and uninformed" about the source and use of TIF and Brownfield funds, or was "less than candid with the general public."

The circuit court remanded the matter to the city commission, stating in relevant part:

For all the foregoing reasons, the Court remands this matter to the Traverse City Commission for a cogent analysis of the project's impact on infrastructure, facilities and services, the source of funds to pay for that impact and an intelligent discussion of the perceived benefits that support justifying such extensive public subsidies on the backs of local taxpayers. If the Commission has this discussion and believes it can justify its decision, it will explain why and approve this SLUP once more and with a more robust record. Only at that time would the issue of Section 28 [of the Traverse City Charter] become ripe for consideration.

The court entered a written order vacating the SLUP for the reasons stated on the record in its bench opinion; the matter was remanded to the city commission for further proceedings. Pine Street now appeals.

---

[1] TIF stands for "tax increment financing," which the court explained was "simply the use of the developer's local property tax dollars to support the developer's own project in derogation of a contribution to local jurisdictions' general funds."

[2] The Brownfield Redevelopment Financing Act, MCL 125.2651 *et seq*. The court explained that "[t]o the degree that Brownfield funds intercept city and county general fund dollars to eradicate environmental contamination those funds benefit the environment, but not the general fund of the city." The court also stated that to the extent Brownfield funds were used to combat "so-called blight, they are simply a disguised form of tax increment financing or another vehicle by which developers do not support the general fund, but use their tax revenues to pay for their own project."

We first address Pine Street's argument that appellees lack standing to bring this action. "Whether a party has standing is a question of law that is reviewed de novo by this Court." *Coldsprings Twp v Kalkaska Co Zoning Bd of Appeals*, 279 Mich App 25, 28; 755 NW2d 553 (2008).

> Under Michigan law,
>
> > a litigant has standing whenever there is a legal cause of action. Further, whenever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment. Where a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing. *A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large* or if the statutory scheme implies that the Legislature intended to confer standing on the litigant. [*Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372; 792 NW2d 686 (2010) (emphasis added).]

Further, to have standing to challenge a zoning decision a party must be "aggrieved" and have "suffered some special damages not common to other property owners similarly situated." *Unger v Forest Home Twp*, 65 Mich App 614, 617; 237 NW2d 582 (1975), citing *Joseph v Grand Blanc Twp*, 5 Mich App 566; 147 NW2d 458 (1967) and *Marcus v Busch*, 1 Mich App 134; 134 NW2d 498 (1965).

Turning first to appellee Townsend, we are satisfied, that she has standing to bring this suit. Townsend does assert some grounds in support of her having standing that do not meet the requirement that she show special damages different from that suffered by the public at large. For example, her claim of increased traffic is the same as that suffered by the public at large. The same can be said for her argument that the project would change the character of the neighborhood. But, we are satisfied with her argument that the project would affect the airflow, sunlight and view from the window of her apartment. It is true that Michigan law does not recognize a legally protected interest in receiving airflow, sunlight, or a view. See *Krulikowski v Tide Water Oil Sales Corp*, 251 Mich 684, 687; 232 NW2d 233 (1930) ("An easement for light and air may not be acquired by use or by prescription. An adjoining owner may build up to his lot line, unless restricted from doing so, or unless he intends thereby to injure his neighbor or acquire no advantage or benefit to himself."). Nevertheless, the loss of access airflow, sunlight, or a view could be considered a "special injury" to Townsend, even if she has no legal entitlement to those things. This special injury would also affect Townsend differently from the citizenry at large because it would specifically affect her as the resident a building adjacent to the proposed development. Therefore, this special injury would confer standing on Townsend. *Lansing Sch Ed Ass'n*, 487 Mich at 372. Indeed, such considerations may, at least in part, be some of the city's reasoning in adopting the ordinance that restricts building heights in the first place; if so, then those considerations would be relevant to the decision whether to grant the SLUP.

NMEAC also may have standing to bring this suit; a decision in that regard is premature at this juncture. "A nonprofit corporation has standing to advocate interests of its members

where the members themselves have a sufficient stake or have sufficiently adverse and real interests in the matter being litigated." *Trout Unlimited, Muskegon White River Chapter v City of White Cloud*, 195 Mich App 343, 348; 489 NW2d 188 (1992). Similarly, the United States Supreme Court has declared that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc v Laidlaw Environmental Servs (TOC), Inc*, 528 US 167, 183; 120 S Ct 693; 145 L Ed 2d 610 (2000) (citation omitted).[3]

NMEAC asserted that it is a non-profit organization devoted to protecting the environment and that its members included "individuals who reside in the immediate vicinity of the SLUP that is at issue." NMEAC's complaint asserted that it or its unnamed members would be "uniquely impacted" by the SLUP for three reasons. First, it contended that the city environment, the Boardman River, the surface and subsurface soils, contamination in the soil, glare, solar power access impairment, bird migration, and airflow would all be "impacted and/or degraded." Second, it contended that the SLUP and resulting development project would radically change the character of Traverse City. Third, it contended that the NMEAC members that pay city taxes would suffer an "increased burden" because of the "financial requirements imposed on City residents by the SLUP project." These allegations sufficed to confer standing on NMEAC at the pleading stage. See *Nat'l Wildlife Federation*, 471 Mich at 631. When a challenge to standing is raised in a motion for summary disposition, the plaintiff has the obligation to support its standing allegation with evidence. *Id*. As this Court recently explained, "standing to sue . . . is a fact-bound concept more amenable to proof rather than to pleading." *Lamkin v Hamburg Twp Bd of Trustees*, 318 Mich App 546, 551; 899 NW2d 408 (2017).

Pine Street Development One, LLC first raised the issue of NMEAC's standing in a brief filed in the trial court on March 22, 2016, three days before the trial court conducted oral argument on the merits of the case. The parties did not address the standing issue at the hearing. More significantly, the trial court did not make any findings or a ruling on standing in its March 31, 2016 opinion. When Pine Street claimed an appeal in this Court, its brief included a standing argument. NMEAC attempted to reply by filing with its brief on appeal an affidavit signed by one of its members. This Court struck the affidavit as outside of the record. *NMEAC v Traverse City*, unpublished order of the Court of Appeals, entered August 15, 2016 (Docket No. 332590). The affidavit was not filed with the trial court because Pine Street's challenge to standing came late in the proceedings and was deemed irrelevant by the circuit court.

---

[3] Michigan's standing doctrine meaningfully differs from that of the federal courts, in that unlike the United States Constitution, Michigan's Constitution "does not inherently incorporate the federal case-or-controversy requirement, and, in fact, importing this requirement is inconsistent with this Court's historical view of its own powers and the scope of the standing doctrine[.]" *Lansing Sch*, 487 Mich at 366. That difference is inconsequential in this case. The general standing principles applicable to nonprofit organizations in the federal courts remain helpful in analyzing the standing of nonprofit corporations in Michigan.

NMEAC's standing depends on the resolution of factual questions regarding whether members of NMEAC would have standing. The resolution of those factual questions is the task of the circuit court, if and when this matter returns to that court. We take no further position on this issue.

We now turn to the merits of this case. "This Court reviews de novo a trial court's decision in an appeal from a city's zoning board, while giving great deference to the trial court and zoning board's findings." *Norman Corp v City of East Tawas*, 263 Mich App 194, 198; 687 NW2d 861 (2004).

> When reviewing a zoning board's decision whether to issue an exception to a zoning ordinance, this Court must review the record and . . . [the board's decision] . . . to determine whether it (1) comports with the law, (2) was the product of proper procedure, (3) was supported by competent, material, and substantial evidence on the record, and (4) was a proper exercise of reasonable discretion. . . . [*Whitman v Galien Twp*, 288 Mich App 672, 678-679; 808 NW2d 9 (2010) (internal quotation marks omitted, alteration in original).]

" 'Substantial evidence' is evidence that a reasonable person would accept as sufficient to support a conclusion. While this requires more than a scintilla of evidence, it may be substantially less than a preponderance." *Hughes v Almena Twp*, 284 Mich App 50, 60; 771 NW2d 453 (2009). This Court reviews the circuit court's determinations regarding the zoning board of appeals findings for clear error, which occurs where this court is "left with the definite and firm conviction that a mistake has been made." *Hughes*, 284 Mich App at 60.

The trial court concluded that the city's determination in granting the SLUP was not supported by competent, material, and substantial evidence. We do not agree in all aspects with the trial court's decision. That is, there are areas in which the trial court determined a lack of support that we conclude were adequately supported. Nonetheless, we do agree in some respects with the trial court's determination and, therefore, with its ultimate conclusion to remand the matter to the city commission with direction that it must provide further support for its decision. Accordingly, we will focus on those areas in which we agree with the trial court that the record was lacking in competent, material, and substantial evidence to support the city's decision.

First, at issue is whether the City Commission's determination that Traverse City Zoning Ordinance 1364.02(c) was met is supported by competent, substantial, and material evidence. Traverse City Zoning Ordinance 1364.02(c) provides as follows:

> Each application for a special land use shall be reviewed for the purpose of determining that the proposed use meets all of the following standards:
>
> * * *
>
> (c) The use shall be served adequately by existing or proposed public infrastructure and services, including but not limited to, streets and highways, police and fire protection, refuse disposal; water, waste water, and storm sewer facilities; electrical service, and schools.

The city commission made the following findings of fact relating to ordinance 1364.02(c):

1. Facts and conclusions in the staff report dated October 29, 2015, with regard to this standard are adopted.

2. Various departments, including the Engineering Department, Police Department, Traverse City Light and Power, and the Fire Department through its Fire Marshal, have found this use to be safe and adequately served by public infrastructure, and services.

3. Street improvements will be made.

4. As pedestrian and bicycle use increases, motorists will regard the area more as a heavily-traversed area by such users, making it safer.

5. The trip generation manual used by the City Planning Department is considered conservative estimate, which means that the number of vehicle trips may actually be less than otherwise anticipated by the Planning Department by its use of such manual.

In turn, the October 29, 2015, staff report adopted by the city commission provided the following analysis and findings relating to zoning ordinance 1364.02(c):

**Analysis** *The proposed buildings are located on Front and Pine Streets which are both designated as collector streets. Nearby are Division Street and Grandview Parkway which are designated as arterials. Schools should not be significantly impacted by the proposed residential dwellings in this building. There are adequate utilities to serve this building. Overhead electrical lines that run from the Warehouse District across the river south to Hannah Park are planned to be buried in Spring of 2016. The developer will work with Traverse City Light and Power and City Engineering for a plan to have a power supply once the undergrounding takes place. A 12-inch water main is located under Front Street. An 8" sanitary sewer is located under Pine Street. The City Engineer has previously stated that the existing utilities to serve the development are adequate. The Police Department has indicated no concerns with the development.*

*The Fire Department has raised concerns of being able to maneuver the 55-foot ladder truck to be adjacent to the riverfront building's long access as required by the Fire Code. The Fire Marshall will need to review the diagram submitted by the developer on October 28, 2015 that indicates a fire truck of this size and type can be in fact positioned along the riverfront building. The access route for the fire truck would be within the parking structure so this parking structure will need to meet the structural specifications to handle the weight of the ladder truck.*

**Finding** *Provided the Fire Marshall finds the access routes to the development meet the Fire Code, the use can be served adequately by existing facilities and services.*

Appellees argue that the city commission's determination was not supported by competent, substantial, and material evidence. Appellees contend that the analysis and findings in the staff report relied upon by the City are conclusory and lack supporting data and evidence.

Appellees are correct that aspects of the staff report reach conclusions without offering supporting evidence. For example, ordinance 1364.02(c) requires the City to consider whether the use will be adequately served by existing schools and police protection, but the report states, without explanation or evidence, "Schools should not be significantly impacted by the proposed residential dwellings in this building." Regarding police protection, the staff report simply mentions that "[t]he Police Department has indicated no concerns with the development." These statements are not substantial evidence because a reasonable person would not accept a conclusory statement without explanation or supporting data sufficient to justify the conclusion. Assuming that the City could rely on the opinion of an employee in the police department, there was no indication in the report what department employee found the development would be adequately served by police protection nor what evidence supported that conclusion. In other words, the purported approval by the police department, without naming any person making the approval or explaining the reason for it, is a mere "scintilla" of evidence.

Next, Ordinance 1364.02(c) requires the City to consider whether the use will be adequately served by existing streets and highways. Appellees are correct that the staff report devotes minimal analysis to this issue because it merely estimates that the development will generate 1,600 vehicle trips per day according to a "Trip Generation Manual," and minimizes this number by stating that it "may be overly high" because the development is downtown and people might choose to walk, bike, or use public transit. The City commission explicitly agreed, stating that the estimate was "conservative" and that the number of actual vehicle trips might be less than estimated.

Appellees contend that there was no traffic analysis performed or presented as to whether existing streets could accommodate this increase in traffic. Pine Street asserts that a "transportation network functional classification" and traffic count map were submitted below that support the conclusion that existing streets could adequately handle increased traffic. But the "transportation network functional classification" map merely classifies roads in Traverse City by type, i.e., city road, county road, private road, etc., and we are unable to discern what data, if any, the traffic count map provides. A section of the staff report addressing another ordinance subsection concluded that the street system could handle the increase in traffic, but it provided no rationale or data to support that. Thus, the record does not support the conclusion that existing streets and highways could handle additional traffic because the evidence highlighted by Pine Street contains no meaningful data about how the proposed development would affect traffic patterns.

In sum, the conclusion that the development was adequately served by police protection, existing highways and streets, and local schools was not supported competent, material, and substantial evidence because there was a lack of evidence regarding the adequacy of those public services or whether an appropriate city employee made any substantial appraisal of those services.

We now turn to the city commission's determination regarding Traverse City Zoning Ordinance 1364.02(d). Traverse City Zoning Ordinance 1364.02(d) provides:

> Each application for a special land use shall be reviewed for the purpose of determining that the proposed use meets all of the following standards:
>
> * * *
>
> (d) The use shall not create excessive additional requirements for infrastructure, facilities, and services provided at public expense.

The City commission made the following findings of fact relating to ordinance 1364.02(d):

> 1. Facts and conclusions in the staff report dated October 29, 2015, with regard to this standard are adopted.
>
> 2. The project will bring additional tax revenue which will provide additional infrastructure, facilities and services, including through TIF and Brownfield programs.

In turn, the October 29, 2015, staff report adopted by the city commission provided the following analysis and findings relating to zoning ordinance 1364.02(d):

> **Analysis** *The current electrical undergrounding along Pine Street and the pedestrian bridge were planned capital project improvements for the district. The sewer main along the alley will eventually need to be relined with or without this proposed development. Tax Increment Financing will pay for half of the streetscape improvements and the developer will pay for all of the pedestrian bump-outs. Additional tax revenues generated by the development will off-set the increase of municipal service costs required for a growing community.*
>
> **Finding** The building will not create any excessive expenditure with public funds.

Appellees argue that the city commission's determination that zoning ordinance 1364.02(d) was satisfied was not supported by competent, substantial, and material evidence. Appellees contend that the commission did not determine whether the development required additional infrastructure or services that would be excessive and the public cost to provide upgrades to infrastructure and services. Appellees argue that the staff report is devoid of factual analysis and provides only conclusions unsupported by facts or data. Indeed, the staff report's analysis merely mentioned electrical undergrounding that was already planned and sewer relining that would need to be redone with or without the proposed development. The only specific factual analysis in the report was a conclusion that TIF funds would pay for half of streetscape improvements while the developer would pay for pedestrian "bump-outs." No other infrastructure improvements were discussed.

Further, appellees point out that the staff report and city commission concluded that the development would provide tax revenue to offset the costs of increased services and infrastructure, but TIF funds would be provided to the developer, which would divert the City's

tax revenue from the project to the developer. This got the attention of the circuit court, which suggested (in somewhat contemptuous terms) that it was impossible to believe that the tax revenue generated by the development would offset the increased cost of services and infrastructure requirements when TIF funds diverted the City's tax revenue derived from the project to subsidize the developer's expenses.[4]

The city commission's conclusion that the proposed development would create additional tax revenue that offset the increased cost of infrastructure and services is not supported by substantial evidence. Indeed, the city commission merely adopted the staff report's conclusion and repeated it; there was no factual analysis or data to support that conclusion. A mere conclusion without reasoning or factual analysis to support it is not "evidence that a reasonable person would accept as sufficient to support a conclusion." *Hughes*, 284 Mich App at 60.

Further, as the circuit court explained, the fact that the development would use TIF and Brownfield funds contradicts the finding that the development's tax revenue would offset increased city costs to the extent that those funding sources divert future tax dollars from the City to the developer.[5] To the extent that only some of the tax revenue generated by the development could go to TIF and Brownfield programs, the relevant section of the staff report contained no data explaining how much, if any, would go to the programs and how much, if any, the City would retain. Thus, the city commission's conclusion was not supported by competent, material, and substantial evidence. Therefore, the circuit court did not clearly err in relation to this determination.

Appellees also assert that the city commission and staff report neglect to analyze evidence relating to increased infrastructure for parking. Appellees criticize the development's inclusion of only 177 parking spaces to accommodate its 162 residential units and commercial space. But as Pine Street points out, that the staff report does address parking is consistent with its assertion that the zoning district does not require the development to provide parking; nevertheless the plan includes a garage with 177 spaces and bicycle racks.

Appellees assert that the City entered into an option agreement to purchase land across the street from the proposed development to potentially construct a parking structure to accommodate the need for extra parking. The circuit court addressed this issue, holding that constructing a parking garage for Pine Street was "certainly not a public benefit" and that "[n]o portion of this record may be remotely considered as a candid disclosure of the actual public expense let alone an analysis of those costs relative to perceived public benefits." Indeed, the

---

[4] The circuit court made the following remark about the apparently contradictory findings made by the staff report and commission: "One cannot help but recall the Queen's comment to Alice on the practice of believing impossible things, 'Why, she said, sometimes I've believed as many as six impossible things before breakfast!' So it must be with City staff."

[5] The circuit court explained that TIF and Brownfield funds represent local property tax funds from the development that would have otherwise gone to the City's general fund but instead pay the developer's costs.

staff report and the city commission did not address whether the City's tentative plan to build a parking garage to support the development would be an excessive expenditure to improve infrastructure with public funds. Therefore, the circuit court did not clearly err in relation to its determination.

In sum, the conclusion that the development would not create excessive expenditures with public funds was not supported by competent, material, and substantial evidence. The commission concluded that the development would generate tax revenue to offset the cost of city infrastructure and services without providing supporting data or reasoning. Further, the assertion that the development would receive TIF and Brownfield funds contradicted the city commission's findings to the extent that those programs divert tax dollars generated from the development and return them to the City. But in any event, those concerns did not address the central question of zoning ordinance 1364.02(d), which is whether the use would create excessive additional requirements for city services and infrastructure. Finally, the city commission did not address the City's tentative plan to construct a parking garage to support the development and whether that would constitute an excessive infrastructure requirement paid for at the public expense.

We next consider Pine Street's argument that the whole of the circuit court's analysis is faulty because it analyzed the entire development project instead of only the special use, the additional 36 feet of height, that was the subject of Pine Street's special land use request. According to Pine Street, the court should have analyzed zoning ordinances 1364.02(c) and (d) only in relation to the additional height and compare its impact with a building Pine Street could construct by right without a special land use permit. We agree with appellee that this argument is irrelevant in analyzing the trial court's decision inasmuch as we agree that there was a lack of competent, substantial and material evidence to support the city's decision. But the argument is relevant to how the city should proceed on remand in analyzing this issue.

Traverse City Zoning Ordinance 1364.02 addresses the standards of approval for special land use permits and provides as follows:

> Each application for a *special land use* shall be reviewed for the purpose of determining that the proposed *use* meets all of the following standards:
>
> > (a) *The use* shall be designed, constructed, operated, and maintained so as to be harmonious and compatible in appearance with the intended character of the vicinity.
> >
> > (b) *The use* shall not be hazardous nor disturbing to existing or planned uses in the vicinity.
> >
> > (c) *The use* shall be served adequately by existing or proposed public infrastructure and services, including but not limited to, streets and highways, police and fire protection, refuse disposal; water, waste water, and storm sewer facilities; electrical service, and schools.
> >
> > (d) *The use* shall not create excessive additional requirements for infrastructure, facilities, and services provided at public expense.

(e) *The use* shall not involve any activities, processes, materials, equipment or conditions of operation that would be detrimental to any person or to the general welfare by reason of excessive production of traffic, noise, smoke, fumes, glare, odors or water runoff.

(f) Where possible, *the use* shall preserve, renovate, and restore historic buildings or landmarks affected by the development. If the historic structure must be moved from the site, the relocation shall be subject to the standards of this section.

(g) Elements shall relate to the design characteristics of an individual structure or development to existing or planned developments in a harmonious manner, resulting in a coherent overall development pattern and streetscape.

(h) *The use* shall be consistent with the intent and purposes of the zoning district in which it is proposed. [Emphasis added.]

Appellees contend that the court must evaluate the entire use of land, i.e., the whole development because the ordinance mentions "special land use" in its introductory sentence, but refers only to "the use" instead of "the special land use" in its subsections. Appellees justify this conclusion by raising the legal maxim *expressio unius est exclusio alterius* ("the express mention in a statute of one thing implies the exclusion of other similar things." *AFSCME Council 25 v Detroit*, 267 Mich App 255, 260; 704 NW2d 712 (2005)). However, this precept is an aid to statutory interpretation that cannot control if its application would defeat the clear legislative intent. *Id*.

The introductory clause of the ordinance clearly establishes the contextual relationship of the terms "special land use" and "use.' Again, that passage provides:

Each application for a special land use shall be reviewed for the purpose of determining that the proposed use meets all of the following standards:

The passage actually ties the two terms together. The "use" spoken of is function of the property underlying the "special land use" permit. The passage provides that the listed standards will be employed to consider whether the "use" proposed is in keeping with identified land uses encouraged by the ordinance within a given zoning district.

Interpreting the statute in the way appellee suggests would defeat the clear intent of the City. The City explains that the purpose of ordinance chapter 1364 is to "permit and provide for a special review process for unique uses and activities in zoning districts where they would not otherwise be permitted, provided these uses and activities are made compatible with permitted

uses in these districts by following the standards in this Chapter."[6]  The fact that this entire ordinance chapter addresses special uses belies appellee's argument that the phrase "the use" in zoning ordinance 1364.02 *necessarily* means the general or overall use of the development rather than the particular special land use that the City is reviewing.  Further, certain special uses contemplated by the ordinance implicate only partial use for a special purpose, such as for communication antennas under zoning ordinance 1364.01(c)(2).

Nevertheless, in most situations a special land use encompasses all aspects of the proposed land use, e.g., in the case of a school or correctional facility, which require a SLUP in certain zoning districts under zoning ordinance 1364.01(b)(6) and (11).  Likewise, Pine Street's application for a SLUP to build a "Taller building"[7] in accordance with zoning ordinance 1364.01(b)(13) implicates the entirety of the land use because the land would be occupied by two 96-foot-tall buildings.  Thus, in reference to the instant case, the "use" referred to throughout 1364.02 refers to the special land use of constructing a "Taller building," which encompasses the entirety of the land use, not just the extra 36 feet of height requested by Pine Street.

In conclusion, certain aspects of the city commission's decision regarding zoning ordinance 1364.02(c) were not supported by competent, material, and substantial evidence.  Likewise, the city commission's decision with respect to zoning ordinance 1364.02(d) was not supported by competent, material, and substantial evidence.  Accordingly, we agree with the trial court's determination that this matter must be remanded to the city commission for further action.  As for the trial court's determination that section 28 of the city charter might require a public vote on any construction in which public funds are potentially used, that determination is premature.  Indeed, the trial court did not actually hold that a public vote was required; rather, it merely observed that it might be.  As the trial court determined, the issue is not yet ripe until there is a final resolution of this matter by the city.  Any comments made by the trial court are merely dicta and do not constitute a holding.  The trial court may determine this issue if and when it becomes ripe for decision.

The decision of the trial court to remand this matter to the city for further proceedings is affirmed.  Appellees may tax costs.

/s/ Christopher M. Murray
/s/ Elizabeth L. Gleicher

---

[6] This quote is not in a provision of the ordinance, but it is the preamble to Traverse City's "Special Land Use Regulations" Ordinance Chapter 1364.  See <http://www.traversecitymi.gov/downloads/1364.pdf> (accessed March 24, 2017).

[7] Zoning ordinance 1364.08(m) defines "Taller buildings" as those over 60 feet in height, such as the proposed 96-foot-tall development at issue in this case.