*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RANA AL-SAHLI,

        Plaintiff-Appellant,

v

CRYSTAL LASTARR GRISSOM-DAVIS,

        Defendant-Appellee.

UNPUBLISHED
September 10, 2020

No. 348176
Oakland Circuit Court
LC No. 2018-165557-NI

Before: MARKEY, P.J., and K. F. KELLY and TUKEL, JJ.

PER CURIAM.

In this action for noneconomic tort damages under the no-fault act, MCL 500.3101 *et seq*., plaintiff appeals the trial court's order granting defendant's motion for summary disposition and dismissing the case. Plaintiff argues that the trial court erred by concluding that she did not suffer an objectively manifested impairment. This appeal is being decided without oral argument pursuant to MCR 7.214(E)(1). We reverse and remand for further proceedings.

## I. FACTS

This case arises out of plaintiff's involvement in an automobile accident on February 13, 2017, when she struck defendant's vehicle after defendant allegedly pulled out in front of her from a parking lot. Plaintiff commenced this negligence action, alleging that the accident injured or aggravated preexisting conditions of her lower back and neck. The parties disputed below whether plaintiff presented sufficient evidence to establish the requisite threshold "serious impairment of body function" to recover tort damages under the no-fault act. See MCL 500.3135(1) and (5). Specifically, they disputed whether the evidence established that plaintiff suffered an "objectively manifested impairment" as a result of the accident.

Plaintiff was involved in an earlier automobile accident in November 2015. After that accident she was taken to the hospital by ambulance, diagnosed with low back and cervical strains, and discharged the next day. She afterward complained of lower back and neck pain, and a computed tomography (CT) scan revealed "small probable bone islands" within the "L5 vertebral body," and "[m]ild S-shaped scoliosis." Continuing complaints of neck pain and lower back pain led to magnetic resonance imaging (MRI) testing, which showed "[l]oss of lordosis" and "[s]mall

central disc protrusion with small annular fissure/tear at C5-C6 which indents the central ventral thecal sac" in connection with her cervical spine, and demonstrated "[l]oss of lordosis" and "[b]road-based disc bulge at L4-5 with effacement of the ventral thecal sac and bilateral facet arthrosis with fluid in the facet joints and ligamentum flavum thickening" in connection with her lumbar spine. After receiving two months of medical treatment, including physical therapy, plaintiff felt better. She missed no time from work and was able to take care of her household. Medical records presented in the instant case established that plaintiff did experience some lower back pain after the 2015 accident, characterized as "on and off," "mainly localized," and "stable and manageable." Thus, although not completely asymptomatic after the 2015 accident, plaintiff's back and neck pain steadily improved to the point that she did not have any physical limitations at the time of the February 2017 accident.

After the 2017 accident, plaintiff was transported by ambulance to the hospital where she complained of a headache, leg weakness, and neck and lower back pain. A CT scan of her head and cervical spine revealed no acute fracture and a normal alignment of the cervical spine and facet joints. Plaintiff was diagnosed with "cervical strain, acute" and discharged the same day.

After plaintiff was discharged from the hospital she complained that she was "in bed" and experiencing "a lot of pain." Two weeks after the accident she presented to Dr. Arvinder Dhillon, a board-certified physician in physical medicine and rehabilitation, and reported that before the 2017 accident she experienced "on and off lower back pain," which she attributed to her 2015 accident, but plaintiff told Dr. Dhillon that she was now experiencing worsening symptoms. Dr. Dhillon diagnosed plaintiff with "[l]ower back pain/radiculopathy," "cervical sprain strain/radiculopathy," and "[p]aresthesias." He also noted that plaintiff's responses to a questionnaire inquiring into pain and ability to perform various activities "puts her at a severe disability." Dr. Dhillon issued disability certificates to plaintiff, restricting her from work, housework, driving, and recreational activity; he also initially prescribed attendant care. Dr. Dhillon stated on the certificates that he found plaintiff to be disabled or restricted plaintiff as a result of the injuries she sustained in the 2017 accident and specified diagnoses of cervical sprain/strain, lower back sprain/strain and headaches.[1] He also ordered MRI examinations of plaintiff's lumbar and cervical spine "because of her previous injuries and worsening of her symptoms with radicular components," prescribed pain medication, and referred her to physical therapy, which plaintiff engaged in for several months.

MRI examinations of plaintiff's cervical and lumbar spine undertaken in March 2017 revealed "[s]table central disc protrusion at C5-6 which indents the central ventral thecal sac" in connection with her cervical spine, and "[l]oss of lordosis," "[s]table broad-based disc bulge at L4-L5 which effaces the ventral thecal sac and abuts the intrathecal nerve roots with a stable annular fissure/tear," and a "[h]emangioma in the body of L5" in connection with her lumbar spine. The MRI reports did not specify whether plaintiff's disk conditions were caused or aggravated by accident-related trauma.

---

[1] A subsequent disability certificate additionally stated cervical and lumbar radiculopathy.

Plaintiff continued treatment with Dr. Dhillon for several months. Dr. Dhillon continued to diagnose plaintiff with lower back and cervical sprains/strains along with lumbar and cervical radiculopathy. He additionally, as late as January 14, 2018, continued to find her disabled from working, housework, and recreational activity as a result of the injuries from the accident.

On July 31, 2017, approximately five months after the accident, Dr. Raymond Bauer performed an independent medical evaluation of plaintiff related to her claim for no-fault benefits. Dr. Bauer diagnosed plaintiff with neck and back strain and preexisting chronic back pain; he also noted a "good" prognosis. Dr. Bauer opined that there was no need for further treatment, disability, or replacement services. Dr. Bauer additionally opined, however, that work disability and replacement services during the first four to six weeks after the accident, while typically not necessary, "would not be out of the question." He also opined that, based on plaintiff's medical history, plaintiff's recent treatment had been related to the 2017 accident, but there were "no objective findings on clinical exam" and "no further treatment" was needed. He further noted that "[m]ost likely her MRI findings are degenerative in nature and it would be difficult to attribute these findings to [the 2017] motor vehicle accident given the degenerative nature and the history of [the 2015] motor vehicle accident and back pain."

In December 2017 plaintiff presented to Dr. Teck Soo, a spine surgeon, complaining of an exacerbation of her symptoms following the February 2017 accident, characterizing her low back pain as "severe" and "constant," "aching and sharp," "associated with burning," and "aggravated by sitting, walking, standing, bending, twisting, and rolling over." Dr. Soo opined that the MRI of her lumbar spine was "unremarkable," demonstrating "no disc herniation, nerve root compression, instability, or fracture." He additionally opined that "[t]here is no remarkable lumbar pathology identified that may be contributing to the patient's pain."

In April 2018, Dr. Adeel Khalid, a radiologist, independently reviewed plaintiff's 2015 and 2017 MRIs and CT scans of her cervical and lumbar spines. Overall, Dr. Khalid opined that the cervical disk protrusion and lumbar disk bulge observed on the 2017 MRI examination were consistent with those observed on the 2015 imaging studies, having remained "stable" with no significant progression from 2015 to 2017.[2] Dr. Khalid opined that plaintiff's disk conditions were chronic, mild, and degenerative in nature, and of a sort that would take several years to develop. Significantly, Dr. Khalid concluded as follows:

---

[2] Although the 2017 radiology report of plaintiff's lumbar spine contained an additional finding of an "annular tear/fissure," the original radiology report characterized her lumbar spine as "stable," which, according to Dr. Khalid, meant that the disk bulge was "unchanged" since the 2015 MRI, and was a "chronic disc bulge." Dr. Khalid found no evidence of an "annular fissure/tear," and explained that even if one were present it would take the form of scar tissue related to degenerative change, and thus would be of "no real significance." Dr. Khalid further explained that, while he disagreed with the finding of a hemangioma, it was not clinically significant in plaintiff's case because it was a bone island observed in the 2015 CT examination. Plaintiff did not present any evidence to contradict these findings.

I am still able to determine with a very high degree of medical certainty that there are no acute injuries to the brain, cervical spine (neck) or lumbar spine (low back) based upon the submitted CT and MRI examinations that were performed on the date of the motor vehicle accident and after the motor vehicle accident. The age-appropriate (39 years old in 2017) chronic minor degenerative changes of the spine as evidenced by the C5-C6 chronic tiny disc protrusion with adjacent bone spurs as well as the L4-L5 chronic minor disc bulge would take several years to develop and are also seen to be stable when I compared them "side-by-side" to previous CT and MRI examinations of the spine from 2015 from both MRI Centers of Michigan and Henry Ford Hospital. The stability of these chronic age-appropriate degenerative changes clearly indicates that the accident of February 13, 2017 did not aggravate any of the pre-existing minor degenerative changes and did not cause any type of acute injury such as fracture, subluxation, edema, hemorrhage, or "fresh" disc herniation within the spine.

* * *

Therefore, in conclusion, there is no evidence of any type of acute injury to the brain or spine related to the motor vehicle accident on February 13, 2017. Age-appropriate minor degenerative changes of the cervical spine and lumbar spine identified on the CT and MRI examinations of the spine on the date of the motor vehicle accident and after the motor vehicle accident appear stable when compared to previous CT and MRI examinations that were performed two years prior to the motor vehicle accident in 2015.

Plaintiff nonetheless maintained that the 2017 accident had "a significant impact on [her] life, physically, emotionally, financially and with [her] family relations." According to plaintiff, although she resumed working full time in June or July 2018 as a receptionist at a dental office, because of her back pain, plaintiff often had to rise from her chair and walk around; plaintiff also used lumbar support to relieve the pressure in her lower back. Plaintiff further complained that her ability to engage in yoga or personal exercise was limited after the 2017 accident, and that she performed housework only on the weekends because of pain and other limitations from overexertion. Plaintiff additionally stated that she could not engage in physical activities with her children because of her frustration and irritability attributable to her pain, and, therefore, she spent less time with them than she had before the 2017 accident. Finally, plaintiff also stated that she could not "lift over ten pounds, heavy groceries, or do heavy chores."

Following discovery, defendant filed a motion for summary disposition under MCR 2.116(C)(10), arguing that plaintiff could not meet the threshold requirement of "serious impairment of body function" for tort recovery under the no-fault act. Relying primarily on Dr. Khalid's radiology review, defendant argued that plaintiff could not establish that she suffered an objectively manifested impairment as a result of the 2017 accident, because the medical evidence did not support plaintiff's claim that the 2017 accident aggravated her preexisting disk conditions or caused any acute injury to her spine. In response, plaintiff argued that her disk conditions were "dormant," "asymptomatic," and "non-disabling" after the 2015 accident, but that the 2017 accident aggravated those conditions, as evidenced by her worsened pain and radicular symptoms,

and her treating physician's orders restricting her from work, housework, and recreational activity for almost a year. The trial court then granted summary disposition to defendant. In doing so, the trial court noted that plaintiff offered no evidence to contradict the reports of Dr. Khalid and Dr. Bauer stating that the imaging studies of her spine depicted only degenerative disk conditions that were not aggravated by the accident. It also concluded that plaintiff failed to set forth evidence to create a genuine issue of material fact regarding whether she suffered an objectively manifested impairment as a result of the subject accident. This appeal followed.

## II.  STANDARD OF REVIEW

A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a complaint and is reviewed de novo. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 205-206; 815 NW2d 412 (2012). This Court reviews a motion brought under MCR 2.116(C)(10) "by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018). Summary disposition "is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id*. "There is a genuine issue of material fact when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008). "Only the substantively admissible evidence actually proffered may be considered." *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 525; 773 NW2d 57 (2009) (quotation marks and citation omitted). "Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient." *McNeill-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016).

The moving party has the initial burden to support its claim with documentary evidence, but once the moving party has met this burden, the burden then shifts to the nonmoving party to establish that a genuine issue of material fact exists. *AFSCME v Detroit*, 267 Mich App 255, 261; 704 NW2d 712 (2005). Additionally, if the moving party asserts that the nonmovant lacks evidence to support an essential element of one of his or her claims, the burden shifts to the nonmovant to present such evidence. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 7; 890 NW2d 344 (2016).

## III.  ANALYSIS

"Tort liability is limited under the Michigan no-fault insurance act." *Patrick*, 322 Mich App at 606, citing *McCormick v Carrier*, 487 Mich 180, 189; 795 NW2d 517 (2010). Under MCL 500.3135(1), a "person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." A "serious impairment

of body function" is defined as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(5).[3]

Our Supreme Court has established a three-part test to determine when a plaintiff has suffered a serious impairment of body function, requiring a plaintiff to establish:

> (1) an objectively manifested impairment (observable or perceivable from actual symptoms or conditions) (2) of an important body function (a body function of value, significance, or consequence to the injured person) that (3) affects the person's general ability to lead his or her normal life (influences some of the plaintiff's capacity to live in his or her normal manner of living). [*McCormick*, 487 Mich at 215.]

"The serious impairment analysis is inherently fact- and circumstance-specific and must be conducted on a case-by-case basis." *Id*. "[W]hen considering an impairment, the focus is not on the injuries themselves, but how the injuries affected a particular body function." *Id*. at 197 (citation and quotation marks omitted). "Although mere subjective complaints of pain and suffering are insufficient to show impairment, evidence of a physical basis for that pain and suffering may be introduced to show that the impairment is objectively manifested. Medical testimony is generally, but not always, required to make this showing." *Patrick*, 322 Mich App at 607. Finally, "[i]f there is no factual dispute, or no material factual dispute," regarding the extent of a plaintiff's injuries "then whether the threshold is met is a question of law for the court." *McCormick*, 487 Mich at 215.

It is apparent from our review of the trial court's ruling that, while the trial court's opinion was presented in language addressing whether plaintiff established that she had an objectively manifested impairment, the trial court actually focused much of its analysis on whether plaintiff suffered any impairment or injury that was caused by the 2017 accident. This analysis was a natural consequence of plaintiff complaining of injuries similar to her 2015 accident. As such, in order to properly address the issue on appeal we must also consider the issue of causation.

Proximate causation is an element of any negligence claim,[4] and as such a plaintiff seeking to recover in negligence under the no-fault act must show that the accident proximately caused the objectively manifested impairment. *Patrick*, 322 Mich App at 616-620. "To establish proximate

---

[3] This statutory definition was in force on March 14, 2019, when this case was decided below. See 2012 PA 158. Effective June 11, 2019, the Legislature amended MCL 500.3135 "to codify and give full effect to the opinion of the Michigan supreme court in *McCormick v Carrier*, 487 Mich 180 (2010)." 2019 PA 21; 2019 PA 22.

[4] "To establish a prima facie case of negligence, a plaintiff must prove the following elements: (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011).

cause, the plaintiff must prove the existence of both cause in fact and legal cause." *Id*. at 616 (citation and quotation marks omitted).

> Establishing cause in fact requires the plaintiff to present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred. Although causation cannot be established by mere speculation, a plaintiff's evidence of causation is sufficient at the summary disposition stage to create a question of fact for the jury if it establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support." [*Id*. (citation and quotation marks omitted).]

The question of causation is "typically reserved for the trier of fact unless there is no dispute of material fact." *Id*. at 616.

As plaintiff correctly asserts, "the aggravation or triggering of a preexisting condition can constitute a compensable injury." *Fisher v Blankenship*, 286 Mich App 54, 63; 777 NW2d 469 (2009). "Regardless of the preexisting condition, recovery is allowed if the trauma caused by the accident triggered symptoms from that condition." *Wilkinson v Lee*, 463 Mich 388, 395; 617 NW2d 305 (2000). The exacerbation of a degenerative condition by subsequent injury can constitute impairment of body function. *Washington v Van Buren County Road Comm*, 155 Mich App 527, 529-530; 400 NW2d 668 (1986).[5] In this case, we agree with the trial court that plaintiff's imaging studies objectively revealed "only . . . degenerative conditions which had not been aggravated by the 2017 accident."

Defendant primarily relies on Dr. Khalid's radiology review opining that the cervical disk protrusion and lumbar disk bulge observed on the 2017 MRIs also were present on the 2015 MRIs, and, significantly, remained "stable" with no significant progression from 2015 to 2017. The MRI reports do not specify whether plaintiff's disk conditions resulted from accident-related trauma, and Dr. Khalid characterized those conditions as "chronic" degeneration that would take several years to develop. Moreover, Dr. Khalid concluded that plaintiff's imaging studies revealed no acute injury to her spine, such as a fracture, subluxation, edema, hemorrhage, or "fresh" disk herniation, and that the age-appropriate degenerative changes to her cervical and lumbar disk conditions remained stable when compared with her 2015 imaging studies. As such, Dr. Khalid clearly opined that the imaging studies revealed no aggravation of preexisting disk conditions as a consequence of the 2017 accident. Additionally, Dr. Soo, the spinal surgeon, physically examined plaintiff, reviewed her 2017 lumbar MRI, and likewise concluded that the MRI showed "no disc herniation, nerve root compression, instability, or fracture," and further reported that "[t]here is no remarkable lumbar pathology identified that may be contributing to the patient's pain." Finally, Dr. Bauer, who performed an independent medical examination, agreed that the MRIs revealed no

---

[5] Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority." *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012) (citation omitted).

acute injury to plaintiff's spine and opined that the conditions revealed by the MRI were likely degenerative in nature and not attributable to the 2017 accident.

Although the imaging studies objectively verified the existence of plaintiff's disk conditions, they did not establish that the accident caused or aggravated those conditions, which remained "stable" after the accident. No treating physician attributed plaintiff's cervical disk protrusion or lumbar disk bulge to the 2017 accident or opined that the accident aggravated or exacerbated these conditions. While plaintiff correctly asserts that the aggravation of a preexisting injuries or degenerative conditions can constitute an objectively manifested impairment, *Wilkinson*, 463 Mich at 395-396; *Fisher*, 286 Mich App at 63-64; *Washington*, 155 Mich App at 529-530, the imaging studies objectively revealed no more than that plaintiff, before and after the 2017 accident, had spinal conditions that might have increased her vulnerability to pain and disabilities associated with the spine. The imaging studies thus comported with plaintiff's assertions of neck and back pain, and physical limitations, after the 2017 accident, but they failed to establish any such linkage to the 2017 accident.[6] The question thus now becomes whether other evidence in the record might fill in that blank.

Plaintiff argues that Dr. Soo explicitly found that the 2017 accident exacerbated the symptoms initially caused by the 2015 accident. But Dr. Soo's statement was not a medical finding; instead, Dr. Soo's statement came in the section of his report about plaintiff's medical history. Dr. Soo did not actually make any medical finding or express any opinion regarding whether the 2017 incident caused or exacerbated plaintiff's pain. As such, plaintiff's reliance on Dr. Soo's report is unavailing.

---

[6] Some commentators have cautioned against overreliance on imaging studies to verify the existence of pain, e.g. the following:

> Courts struggle with questions relating to the reality and verifiability of chronic pain and appear to struggle in particular with the invisibility of pain. . . . Adjudicators may reject well-substantiated claims where the claimant does not offer visual medical evidence like X-rays or MRIs, even though such technologies are often irrelevant to pain diagnosis. Conversely, when adjudicators look at X-rays, MRIs, and other visual evidence that does not—and cannot—show pain, they use these images as corroboration for their intuition that pain not tied to a visible problem does not exist: If the image does not show it, it must not be real. [Pustilnik, *Imaging Brains, Changing Minds: How Pain Neuroimaging Can Inform the Law*, 66 Ala L Rev 1099, 1105-1106 (2015) (footnote omitted).]

See also King & Reid-Miodrag, *"I Feel Your Pain": Visible Evidence of Invisible Phenomena and Other Tales of Round Pegs and Square Holes*, 32 Am J Trial Advoc 235, 259 (2008) ("There is no way to tell how much pain a person has. No test can measure the intensity of pain, no imaging device can show pain, and no instrument can locate pain precisely." (Quotation marks and citation omitted).

Nevertheless, from our review of the entire record in the light most favorable to plaintiff, we conclude that the medical report of Dr. Dhillon, who treated plaintiff for several months after the 2017 accident, provided sufficient evidence that her disabling post-accident condition was objectively manifested and resulted from that accident.

Dr. Dhillon did not offer an opinion on the existence or reasons behind plaintiff's preexisting conditions, but he did acknowledge a "worsening of her symptoms with radicular components" following the 2017 accident. A temporal relationship between an accident and complaints of worsening symptoms alone is not sufficient to support a claim that the accident caused an aggravation, or triggered symptoms, of a preexisting condition. See *West v Gen Motors Corp*, 469 Mich 177, 186; 665 NW2d 468 (2003) (holding that a close temporal relationship, by itself, is insufficient to establish cause and effect). But neither is such timing wholly irrelevant. See *Wilkinson*, 463 Mich at 395-396 (holding that physician testimony establishing that the trauma from an automobile accident could have induced a preexisting brain tumor to exhibit symptoms that appeared afterward would have been sufficient to establish causation). In this case, the evidence clearly shows that plaintiff was largely asymptomatic before the subject accident, but afterward she experienced severe and constant back pain, neck pain, and radicular symptoms. Dr. Dhillon noted a decreased range of motion in plaintiff's back and neck, along with decreased muscle strength in her left lower leg and "hypoactive reflexes" in her lower extremities. He diagnosed plaintiff with a cervical sprain/strain, a lower back sprain/strain with pain, and cervical and lumbar radiculopathy.[7] Noting a "severe" disability, for several months after the accident, Dr. Dhillon restricted plaintiff from working, housework, driving, and recreational activity, and also initially prescribed attendant care. Although plaintiff did not proffer any testimony or an affidavit from Dr. Dhillon regarding the cause of her recent pain and impairment, Dr. Dhillon did state his diagnoses on the disability certificates he signed, and stated as follows: "I have examined and/or treated the above-named patient for injuries sustained in the [2017] accident. As a result of the injuries in this accident, I have disabled and/or restricted the patient from [specified] activities." Dr. Dhillon thus related plaintiff's injuries and disability to the accident.

The trial court stated that the disability certificates "do not present evidence of an objectively manifested impairment; instead they only outline physical restrictions." In doing so, the trial court overlooked that the certificates did bear on the issue of causation precisely because they "outline[d] physical restrictions" that came about "for injuries sustained in the" accident. Although, as the trial court noted, Dr. Dhillon never rendered an opinion "regarding the impairment that was causing Plaintiff's pain," based upon physically examining plaintiff and performing diagnostic tests, Dr. Dhillon observed a decreased range of motion in plaintiff's back and neck, decreased muscle strength in her left leg, and hypoactive reflexes in her lower extremities; he also diagnosed plaintiff with cervical and lumbar sprains/strains and radiculopathy and related her physical disability to the accident, restricting her from work, housework, and recreational activity. Dr. Dhillon's report thus provided evidence from which a juror could reasonably infer that the injuries sustained in the 2017 accident caused plaintiff's functional

---

[7] The emergency room physician also diagnosed plaintiff with an acute cervical strain.

impairments.[8]  Dr. Dhillon linked his diagnosis to the 2017 accident and his observation of plaintiff's decreased range of motion, decreased left leg strength, and hypoactive reflexes was an objective observation.  Consequently, plaintiff presented evidence, albeit slight in comparison to the countervailing evidence, that she suffered an objectively manifested impairment as a result of the 2017 accident.  Nonetheless, viewing that evidence in the light most favorable to plaintiff, as we are required to do, the trial court erred by granting summary disposition to defendant.

## IV.  CONCLUSION

Reversed and remanded for further proceedings.  We do not retain jurisdiction.  Plaintiff, as the prevailing party, may tax costs pursuant to MCR 7.219.

/s/ Jane E. Markey
/s/ Kirsten Frank Kelly
/s/ Jonathan Tukel

---

[8] We additionally note that Dr. Bauer, who performed an independent medical examination of plaintiff five months after the accident, also diagnosing neck and back strain, acknowledged that the treatment plaintiff had received was related to the subject accident, and opined that work disability and replacement services for a limited time would "not be out of the question."  That being said, Dr. Bauer also opined that the medical issues revealed in plaintiff's MRIs were "degenerative in nature and it would be difficult to attribute these findings to [the 2017] motor vehicle accident given the degenerative nature and the history of previous motor vehicle accident and back pain."