*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BAYBERRY GROUP, INC.,

Plaintiff/Counterdefendant-Appellant,

v

CRYSTAL BEACH CONDOMINIUM
ASSOCIATION, GENTLE WINDS
CONDOMINIUM ASSOCIATION, TALL TIMBER
CONDOMINIUM ASSOCIATION, and GREAT
LAKES CONDOMINIUM ASSOCIATION,

Defendants/Counterplaintiffs-
Appellees.

FOR PUBLICATION
October 22, 2020
9:25 a.m.

No. 349378
Leelanau Circuit Court
LC No. 2017-009956-CH

Before: MURRAY, C.J., and CAVANAGH and CAMERON, JJ.

CAMERON, J.

Plaintiff, Bayberry Group, Inc., a successor to the developer of The Homestead, appeals a May 24, 2019 opinion and order, which was entered following a bench trial. We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

This matter arises from a dispute involving the interpretation of condominium documents and Michigan common law as it relates to the obligations of defendants, Crystal Beach Condominium Association, Gentle Winds Condominium Association, Great Lakes Condominium Association, and Tall Timber Condominium Association, to pay for the maintenance, repair, and upkeep of a roadway easement called the South Homestead Road easement. South Homestead Road connects defendants' respective properties and other properties in The Homestead to M-22. Portions of South Homestead Road traverse Gentle Winds's property, Great Lakes's property, and Tall Timber's property.

The Homestead is a recreational resort located on the shores of Lake Michigan. Defendants were four of the five earliest condominium projects at The Homestead, and defendants' master deeds were recorded in the 1970s. Thereafter, the number of condominium associations at The

Homestead increased. In 2013, Bayberry began engaging with representatives of the various condominium associations. Bayberry sought an agreement to share the costs of maintaining the roadways and other areas within The Homestead. Thereafter, the Common Area Maintenance Agreement ("CAM agreement") was created. The CAM agreement provided for maintenance of all of the "roadway areas" within The Homestead, which included the South Homestead Road easement. "Roadway areas" included not only the paved or graveled roadway, but also "lawns and the entirety of any planting bed or any other landscape lying wholly or partially within the width of the roadway easement." A majority of the condominium associations serviced by South Homestead Road executed the CAM agreement, but defendants did not. The CAM agreement became effective on January 1, 2015.

After defendants refused to pay a share of fees under the CAM agreement, Bayberry filed suit against defendants on July 13, 2017. In relevant part, Bayberry alleged that the South Homestead Road easement is a general common element of each condominium project and that, under defendants' master deeds and bylaws, defendants were responsible for its maintenance, repair, and upkeep. Bayberry requested that it be awarded damages for maintenance costs from 2011 through 2017 and that the trial court order defendants to pay an amount "equal to the total costs of maintenance, repair, and upkeep of the easement less the usage costs incurred by all other associations and co-owners." Defendants answered the complaint and denied that the South Homestead Road easement was listed as a common element within their condominium documents. In their affirmative defenses, defendants asserted that the doctrine of waiver and the defense of laches barred Bayberry's claims for damages because Bayberry (and its predecessors in interest) failed to request any cost-sharing payments for more than 35 years following the creation and recording of the condominium documents.

Following a three-day bench trial, the trial court found that "the ingress/egress Easement of South Homestead Road, from M-22 to the Condominium projects, is not a common element of" defendants' master deeds and condominium documents. The trial court held that, because defendants had "no contractual obligation" for the South Homestead Road easement's "maintenance, repair, decoration and replacement," Bayberry was "not entitled to any past damages[.]" The trial court also concluded that, even if defendants had been contractually obligated under their condominium documents to pay for costs associated with the easement, Bayberry's claim for past damages would have been waived and barred by the defense of laches. The trial court held that Bayberry was entitled to "future expenses" for the maintenance of the South Homestead Road easement under common law. Specifically, the trial court held as follows:

> [G]oing forward, [d]efendants are obligated [under common law] to contribute their proportionate share of the cost for maintenance, repair and upkeep of the portion of South Homestead Road necessary for their safe ingress and egress, based on their use, and likewise [Bayberry] is obligated to contribute its proportionate share of the cost for maintenance, repair and upkeep, based on use, for the portion of South Homestead Road that crosses Defendants' real property.
>
> * * *
>
> Defendants' responsibility for repair, maintenance and upkeep of the ingress/egress Easement shall be limited to costs associated with salting and

-2-

sanding, snowplowing, keeping the road clear of debris and repair/replacement/repaving of the road and road drains. Landscaping, mowing, irrigation, electrical/lighting and signage [are] not essential to maintain safe ingress and egress and thus, shall not be included costs associated with "repair, maintenance and upkeep."

The trial court held that "the cost of future repair and maintenance should be distributed among all users in proportions that closely approximate the usage of the respective parties." The trial court created a formula in an attempt to accomplish this. This appeal followed.

## II. STANDARDS OF REVIEW

"This Court reviews a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo. A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003) (citations omitted). "The construction and interpretation of an unambiguous contract is a question of law that we review de novo." See *Rossow v Brentwood Farms Dev, Inc*, 251 Mich App 652, 658; 651 NW2d 458 (2002). "The extent of a party's rights under an easement is a question of fact, and a trial court's determination of those facts is reviewed for clear error. A trial court's dispositional ruling on equitable matters, however, is subject to review de novo." *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 40; 700 NW2d 364 (2005) (citations omitted).

## III. ANALYSIS

## A. BREACH OF CONTRACT

Bayberry first argues that the trial court erred by holding that the "roadway easement was not a common element" of each condominium project. According to Bayberry, because the master deeds and bylaws provide that South Homestead Road is a common element, defendants (along with other co-owners) were solely responsible for the road's maintenance, repair, upkeep, decoration, and replacement. We disagree.

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014). In this case, defendants' master deeds and the relevant accompanying condominium documents constitute the contracts. In interpreting these documents, this Court applies the rules governing construction of a contract. *Rossow*, 251 Mich App at 658-659.

The goal of contract interpretation "is to determine and enforce the parties' intent on the basis of the plain language of the contract itself." *AFSCME v Detroit*, 267 Mich App 255, 261-262; 704 NW2d 712 (2005). The words of a contract "are interpreted according to their plain and ordinary meaning," and this Court "gives effect to every word, phrase, and clause" while avoiding "interpretations that would render any part of the document surplusage or nugatory." *Tuscany Grove Ass'n v Peraino*, 311 Mich App 389, 393; 875 NW2d 234 (2015). If a contract incorporates another document by reference, the two writings should be read together. *Forge v Smith*, 458 Mich

198, 207 n 21; 580 NW2d 876 (1998). Ultimately, this Court enforces clear and unambiguous language as written. *Tuscany Grove Ass'n*, 311 Mich App at 393.

A "master deed" is "the condominium document recording the condominium project to which are attached as exhibits and incorporated by reference the bylaws for the project and the condominium subdivision plan for the project." MCL 559.108. A "condominium project," which is defined as "a plan or project consisting of not less than 2 condominium units established in conformance with [the Condominium Act]," MCL 559.104(1), is established upon the recording of a master deed, MCL 559.172(1). Importantly, the master deed must include an accurate legal description of the land involved in the project. MCL 559.108(a). The Condominium Act specifically addresses easements in MCL 559.135, which states the following:

> Where fulfillment of the purposes of sections 31, 32, 33 or any other sections of this act reasonably requires the creation of easements, then the easements shall be created in the condominium documents or in other appropriate instruments and shall be reasonably described in the condominium documents. The easements shall contain the following:
>
> (a) A description of the permitted use.
>
> (b) If less than all co-owners are entitled to utilize the easement, a statement of the relevant restrictions on the utilization of the easement.
>
> (c) If any persons other than those entitled to the use of the condominium units may utilize an easement, a statement of the rights of others to utilization of the same and a statement of the obligations, if any, of all persons required to contribute to the financial support of the easement.

In this case, all of defendants' master deeds were recorded in the 1970s. As required by MCL 559.108(a), Article 3 of each master deed identifies and includes a legal description of the land involved in the condominium project. Incorporated into each master deed by reference, and attached thereto as Exhibit B, is a series of drawings and survey maps known as the "Condominium Subdivision Plan," which depicted the proposed project. The plan shows the dimensions and locations of the condominium units and everything else within the boundaries of the condominium project, including utility easements and common elements. Exhibit B of each master deed provides that "[a]ccess is provided by a 66 ft. wide easement for ingress and egress." There is no dispute that this easement is the South Homestead Road easement.

The South Homestead Road easement is referenced again in Article 10 of each master deed. Article 10 of each master deed, entitled "Easements for Benefit of the Condominium," provides, in relevant part:

> In addition to the easement for ingress and egress to the Condominium from M-22, and the utility easements, all as are described in the Condominium Subdivision Plan which are granted for the benefit of the Condominium, the Co-owners, their heirs, successors and assigns by the incorporation by reference of the

-4-

Condominium Subdivision Plan into this Master Deed, the following easements are granted:

> (a) Each Co-owner shall have the right, privilege and power in common with the other Co-owners to use and enjoy the Common Elements in accordance with this Master Deed.

Thus, although Article 10 references the South Homestead Road easement, Article 10 does not indicate that the easement is a common element of the condominium project, and it does not include any reference to maintenance, repair, decoration, and/or replacement obligations. Article 10 then goes on to reference additional easements and provides that "[e]ach co-owner shall have the right, privilege and power in common with the other co-owners to use and enjoy the common elements in accordance with this Master Deed." Article 4(k) of defendants' master deeds define "common elements," "where used without modification," to mean "both the general and limited common elements described in Article 7[.]"

None of the subsections of Article 7 specifically reference the South Homestead Road easement for ingress and egress. Nonetheless, Bayberry argues that the South Homestead Road easement can be considered a common element under Article 7(a)(7). Article 7(a)(7) provides the following concerning common elements:

> Such other elements of the project not here designated as general or limited common elements which are not enclosed within the boundaries of an apartment, and which are intended for common use, or are necessary to the existence, upkeep and safety of the project, including but not limited to stairways, laundry rooms and storage areas.

Thus, under Article 7(a)(7), "common elements" include "other elements of the project . . . which are not enclosed within the boundaries of an apartment" and are either "intended for common use, or are necessary to the existence, upkeep and safety of the project[.]"

Bayberry argues that the South Homestead Road easement is necessary "to the existence, upkeep and safety of the project" because, without the easement, defendants would not have access to their respective properties. To determine the meaning of a word or phrase, we must consider the context or setting in which the term appears. *Bloomfield Estates Improvement Ass'n, Inc v City of Birmingham*, 479 Mich 206, 215; 737 NW2d 670 (2007). Contracts must be read "as a whole, giving harmonious effect, if possible, to each word and phrase." *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 50; 664 NW2d 776 (2003). "[W]hen several words are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar." *Atlantic Casualty Ins Co v Gustafson*, 315 Mich App 533, 541; 891 NW2d 499 (2016) (quotation marks and citation omitted). Specifically, "words grouped in a list should be given related meanings." *Id*. (quotation marks and citation omitted).

In this case, Article 7(a)(7) provides examples of "common elements" that are intended to be included in the provision. The examples include "stairways, laundry rooms and storage areas." Roads are not included in the list, but use of the phrase "including but not limited to" establishes that the list is not exhaustive. Nonetheless, we conclude that the examples provided in

Article 7(a)(7) are not in the same category as that of a road. The South Homestead Road easement undoubtedly exists so that an individual can travel (often by a motor vehicle) on a paved surface within and outside of the condominium project. In contrast, "stairways, laundry rooms and storage areas" are located within the four walls of a building and are located within the condominium project. Therefore, we conclude that the plain language establishes that the South Homestead Road easement is not included in Article 7(a)(7)'s definition of common element.

Importantly, Article 7(a)(1) addresses roads. Specifically, Article 7(a)(1) includes "[t]he land described in Article 3," "including driveways, roads, sidewalks and parking spaces" as "general common elements" of each respective condominium project. The South Homestead Road easement is not described in Article 3 of Gentle Winds, Great Lakes and Tall Timber's master deeds. Article 3 of Crystal Beach's master deed states that the property is "[s]ubject to and together with an easement for ingress and egress over an existing road which runs Northeasterly to a 66 ft. road and easement which connects with State Highway M-22." Thus, although the Crystal Beach master deed references the South Homestead Road easement, it does so only to describe a different easement for ingress and egress, which "runs Northeasterly" to the South Homestead Road easement. Nancy Keepelman, who owns a unit at Crystal Beach, testified that the road described in Article 3 of Crystal Beach's master deed is River Edge Road. According to Keepelman, River Edge Road is the "segment between Homestead Road and [Crystal Beach's] parking lot."

Consequently, because the South Homestead Road easement is not described in Article 3 of any of defendants' master deeds, the easement does not fall within the category of "general common elements" outlined in Article 7(a)(1). Given that roads are specifically referenced in Article 7(a)(1), it reasonably follows that the drafters would have included the South Homestead Road easement in Article 7(a)(1) if the drafters had intended for the South Homestead Road easement to be a common element of the condominium project. Therefore, we conclude that the trial court did not clearly err by concluding that Bayberry failed to establish that defendants had breached their respective contracts by failing to pay for the maintenance, repair, decoration, and upkeep of the South Homestead Road easement. Given that the language of the contracts is unambiguous, we decline Bayberry's invitation to consider the conduct of the parties following the recording of the master deeds.

Bayberry next argues that "the roadway easement is a common element" by operation of law. Specifically, Bayberry argues that condominium associations can only hold property as a general common element or a limited common element and that there are no other types of ownership within a condominium project. To support this, Bayberry cites *Paris Meadows, LLC v City of Kentwood*, 287 Mich App 136, 146; 783 NW2d 133 (2010). However, *Paris Meadows* involved taxation issues, which is not at issue in this appeal. Furthermore, in so arguing, Bayberry ignores the fact that the South Homestead Road easement is not listed as a common element in the master deeds and the other relevant condominium documents. Consequently, the trial court did not err by concluding that the easement is not a common element of defendants' condominium projects by operation of law.

## B.  COMMON LAW OBLIGATION TO SHARE MAINTENANCE AND COSTS OF EASEMENT

## 1.  SCOPE OF EASEMENT

Bayberry argues that, although the trial court properly determined that defendants were obligated under common law to pay for a portion of the South Homestead Road easement's repair, maintenance, and upkeep, the trial court erred by limiting each defendant's "obligation to costs related to only the actual paved roadway and not the full 66-foot wide easement." We disagree.

"An easement is the right to use the land of another for a specified purpose," *Schadewald v Brule*, 225 Mich App 26, 35; 570 NW2d 788 (1997), and an easement may be created "by express grant, by reservation or exception, or by covenant or agreement," *Rossow*, 251 Mich App at 661 (quotation marks and citation omitted).  The "use of an easement must be confined strictly to the purposes for which it was granted or reserved," *Blackhawk Dev Corp*, 473 Mich at 41 (quotation marks and citation omitted), and "[t]he owner of the fee subject to an easement may rightfully use the land for any purpose not inconsistent with the easement owner's rights," *Morrow v Boldt*, 203 Mich App 324, 329; 512 NW2d 83 (1994).  The language of the instrument that granted the easement determines the scope of the easement holder's rights.  *Blackhawk Dev Corp*, 473 Mich at 42.  "Once granted, an easement cannot be modified by either party unilaterally." *Schadewald*, 225 Mich App at 36.  When determining an easement's purpose,

> [t]he language of an express easement is interpreted according to rules similar to those used for the interpretation of contracts.  Accordingly, in ascertaining the scope and extent of an easement, it is necessary to determine the true intent of the parties at the time the easement was created.  Courts should begin by examining the plain language of the easement, itself.  If the language of the easement is clear, it is to be enforced as written and no further inquiry is permitted.  [*Wiggins v City of Burton*, 291 Mich App 532, 551; 805 NW2d 517 (2011) (citations omitted).]

In this case, defendants were granted a 66-foot-wide easement for "ingress and egress." The relevant documents do not define ingress and egress, so this Court must consult a dictionary to determine what these terms commonly mean.  *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 526; 697 NW2d 895 (2005).  "Ingress" is defined as "the power or liberty of entrance or access," and "egress" is defined as "the action or right of going or coming out." *Merriam-Webster's Collegiate Dictionary* (11th ed).  An "ingress-and-egress easement" is an easement that grants "[t]he right to use land to enter and leave another's property." *Black's Law Dictionary* (10th ed).  Thus, defendants were granted the right to enter and leave their respective properties. Because the language of the easement is clear, it must be "enforced as written and no further inquiry is permitted."  See *Wiggins*, 291 Mich App at 551 (quotation marks and citation omitted.)

With respect to the repairs and improvements that defendants were required to make, it is well settled that "[t]he making of repairs and improvements necessary to the effective enjoyment of an easement . . . is incidental to and part of the easement." *Mumrow v Riddle*, 67 Mich App 693, 700; 242 NW2d 489 (1976).  Thus, defendants are only required to make repairs and improvements to the easement that are incidental to and part of their ability to safely enter and leave their respective properties.  See *id.*

Bayberry does not dispute the trial court's conclusion that defendants are required to pay for "salting and sanding, snowplowing, keeping the road clear of debris and repair/replacement/repaving of the road and road drains." Rather, Bayberry argues on appeal that the trial court erred by limiting defendants' duties to the paved portion of South Homestead Road. According to Bayberry, defendants have an obligation to maintain the entire 66-foot-wide easement, including not only the paved portion of the easement used for ingress and egress, but also the portion outside the paved area that includes "such items as grass, irrigation, flowerbeds, bushes, trees, lighting, street signs, traffic signs, and curbs." However, we fail to see how maintaining grass, irrigation systems, flowerbeds, bushes, and trees would assist defendants with safely entering and leaving their respective properties. Furthermore, testimony at trial supported that the expenses that Bayberry was trying to recover for the area outside of the paved roadway were not necessary for safe ingress and egress. The trial court clearly found this testimony to be credible. By attempting to impose obligations upon defendants that are beyond maintenance of the easement for ingress and egress, Bayberry is essentially unilaterally attempting to expand the scope of the express easement. Because this is impermissible, we conclude that Bayberry's argument lacks merit. See *Schadewald*, 225 Mich App at 36.

## 2. ALLOCATION OF COSTS

Next, Bayberry argues that the trial court clearly erred or made an error of law in fashioning the formula for calculating maintenance costs in proportion to Bayberry's use and defendants' use of the South Homestead Road easement and Bayberry's easements over defendants' properties. According to Bayberry, the formula used by the trial court to allocate costs is based on speculation and does not allocate cost by use. We agree.

"[I]t is the owner of an easement, rather than the owner of the servient estate, who has the duty to maintain the easement in a safe condition so as to prevent injuries to third parties." *Morrow v Boldt*, 203 Mich App at 329-330. However, "[t]he maintenance costs of an easement used jointly by both the dominant and servient owners are to be paid in proportion to each party's use." *Bowen v Buck and Fur Hunting Club*, 217 Mich App 191, 194; 550 NW2d 850 (1996).

In relevant part, the trial court ruled that

because South Homestead Road is used in common by both [Bayberry], its guests, and invitees, and the Defendants, the cost of *future* repair and maintenance should be distributed among all users in proportions that closely approximate the usage of the respective parties. This applies to both the ingress/egress Easement from M-22 to the Defendants' properties and the Developer-retained easement across the Defendants' properties. [Emphasis in original.]

The trial court found that Crystal Beach has 16 units, that Gentle Winds has 14 units, that Great Lakes has 30 units, and that Tall Timbers has 24 units. The trial court then found as follows:

The total length of South Homestead Road is 4,819 feet. This length has been broken down into eight segments, A1 through A8. The portion of the ingress/egress Easement from M-22 to Defendants' property, segments A1 through A5, is approximately 3,840 feet. Segment A6 is 368 feet and owned by Defendant

Gentle Winds. Segment A7 is 392 feet and owned by Defendant Great Lakes. Segment A8 is 219 feet and owned by Defendant Tall Timber. Thus, [Bayberry's] 979 foot easement over Defendants' property consists of segments A6 through A8.

The trial court found that defendants "have an easement over segments A1 through A5" and further found as follows:

> The total repair, maintenance and upkeep costs . . . for segments A1 through A5, divided by 3,840 feet determines the repair/maintenance/upkeep cost per foot.

> Beach Club Membership, or "Units" that utilize the entire length of South Homestead Road, has been approximated at 331 units. Therefore, in order to ascertain each Defendants' proportional amount, the formula shall be as follows: the Units per Association, divided by 331 "Beach Club" Units, multiplied by the repair/maintenance/upkeep cost per foot, multiplied by 3,840 feet. Similarly, the formula to ascertain [Bayberry's] proportional amount to Defendants' [sic] is 247 divided by 331 "Beach Club" Units, multiplied by the repair/maintenance/upkeep cost per foot, multiplied by 368 feet (for Gentle Winds) or 392 feet (for Great Lakes) or 219 feet (for Tall Timber). [Footnotes omitted.]

On appeal, Bayberry argues that the trial court's allocations of costs is not founded in law because the trial court failed to account for the other users of the South Homestead Road easement. However, it is clear that the trial court accounted for other users when calculating the proportional use of the easement. Specifically, the trial court noted that, along with defendants, "South Homestead Road is also used by other condominium associations, home owners, visitors to and employees and vendors of The Homestead resort." The trial court found that "Beach Club Membership, or 'Units' that utilize the entire length of South Homestead Road, has been approximated at 331 units."[1] In a footnote, the trial court clarified as follows:

> This "Unit" number consists of Defendant's 84 units, plus [Bayberry's] 127 rentals, *plus 100 assumed units for other condominium associations/homeowners*. At trial, there was testimony as to the various use of Defendants' easement by [Bayberry] and [Bayberry's] invitees and guests, including construction vehicles, the resort shuttle, BATA [Bay Area Transportation Authority], food delivery and wedding vendors, American Waste trucks and laundry services for the Homestead. *Given this testimony, the Court believes that 100 additional units is a fair approximation, if not an understatement, of actual use by [Bayberry]*. [Emphasis added.]

Thus, when fashioning a formula for allocation of use, the trial court took into account Bayberry's use of the easement, defendants' use of the easement, and "other

---

[1] The parties note that the 331 units referenced by the trial court appears to be a mathematical error because the sum of 127, 100, and 84 is 311.

guests/homeowners[']" use of the easement. The trial court then attributed the non-parties' use of the easement to Bayberry.

On appeal, Bayberry argues that the trial court's "assumption of 100 other guests/homeowners is a guess not based on fact or testimony." According to Bayberry, "[t]here are over 350 other property owners besides [Bayberry's] guests and the Defendant Associations." According to Bayberry, this is supported by facts in evidence.

Testimony at trial supported that the CAM agreement divided South Homestead Road into portions. A1 through A5 totaled 3,840 feet, A6 totaled 368 feet, A7 totaled 392 feet, and A8 totaled 219 feet. A1 through A5 is the portion of South Homestead Road from M-22 through Sundance.[2] A6 traverses Gentle Winds's property, A7 traverses Great Lakes's property, and A8 traverses Tall Timber's property. It was undisputed at trial that Crystal Beach has 16 units, that Gentle Winds has 14 units, that Great Lakes has 30 units, and that Tall Timbers has 24 units.

Adriene Kokowicz testified that there are 127 "hotel units" at The Homestead. Additionally, there was testimony at trial concerning the number of condominiums and "single units" within The Homestead and how many of those units were available to be rented either through The Homestead's rental program or through third parties, such as Airbnb. James Musial, an owner in Gentle Winds, testified that there were a total of 599 "units" that could potentially use South Homestead Road from M-22 to the Beach Club. This number included defendants' 84 units, and Musial agreed that the remaining 515 units were not all owned by The Homestead. The parties all presented evidence concerning the amount of traffic on the South Homestead Road easement, and extensive testimony was presented concerning how much of that traffic could be attributed to the Beach Club, which Robert Kuras testified was the "premier attraction" for The Homestead. However, none of the parties presented specific numbers concerning the amount of traffic that traversed the easement. Indeed, Kuras acknowledged that he had never hired someone to conduct a "digital count of traffic" and had never hired a "traffic engineer" to perform a "traffic count within the resort."

When allocating use, the trial court found that 331 units utilized the entire length of South Homestead Road. This number consisted of defendants' 84 units, Bayberry's 127 "rentals," and "100 assumed units for other condominium associations/homeowners." In assigning "100 assumed units" to Bayberry, the trial court did not make specific findings of fact concerning why it assigned "100 assumed units" to Bayberry. Rather, the trial court generally referred to testimony concerning the use of defendants' easement by Bayberry and Bayberry's "invitees and guests." The trial court provided examples of vehicles that traversed the easement, and the trial court's examples were supported by the testimony of several witnesses at trial. Based on this, the trial court stated that it "believe[d] that 100 additional units [was] a fair approximation, if not an understatement, of actual use by [Bayberry]." Upon review of the record, however, it appears that the trial court relied on speculation when making this finding.

---

[2] Sundance is a condominium association that is located between Crystal Beach and Gentle Winds.

Specifically, Musial testified that he had created an alternative way of allocating the costs of maintaining the South Homestead Road easement. In explaining his calculations, Musial testified that he had assigned 331 units to Beach Club members, which included an allocation of 153 units "for the hotels and buildings owned by the Homestead." When asked why he did so, Musial testified that testimony at trial established that Beach Club members, "hotel units," people who "rent[ed] through the Homestead[,] and people who rent[ed] their units through the Homestead" all had access to the Beach Club. The following line of questioning then occurred:

> *Counsel for Gentle Winds*. You made this additional calculation based on what you heard at trial about the importance of the beach club and whose limited to actually access the beach club and that sort of thing, is that correct?

> *Mr. Musial*. Right. With the exception that, you know, through the testimony I did [not] know how many Homestead or how many Homestead properties were rented through the Homestead, I knew how many hotels because we discussed that. But, afterwards I went—I went to the resort realties web page, the Homestead's web page, and tallied up that there were 127 rentals currently listed. What's not included in this note is there are 104 hotel units. And, then I made an assumption that there are 100 other beach club members because [Bayberry's] witnesses were asked how many there were, and, you know, wasn't [sic] aware because he said that he's not part of the membership committee for that, so I made an assumption of 100.[3] So, I came up with 331 beach club members[.]

During cross-examination, Musial again agreed that his calculation of 100 "other beach club members" was an "assumption." Musial noted that "the president of the group couldn't tell me what that number was" during his or her testimony so Musial "just assumed it based on what [he] thought might be reasonable, a reasonable estimate, of how many people might be down there." When asked if Musial was able to indicate whether the number was "higher or lower," he responded "I really couldn't."

Because it appears that the trial court inappropriately relied on speculation instead of evidence when making its determination concerning allocation of use of the easement, we must vacate that portion of the opinion and order and remand the matter to the trial court. On remand, the trial court must make specific findings of fact concerning use of the easement and must comply with *Bowen*.

Bayberry also argues that the trial court erred by failing to address "the easement that is the National Lakeshore Area." According to Bayberry, "*Bowen* likewise requires payment" for maintenance, upkeep, and repair in that area. Bayberry notes that "[t]he National Lakeshore Area is th[e] area from M-22 almost to the Welcome Center but outside the Roadway Easement that is maintained by The Homestead. It is essentially a large grass lawn with some trees, two flower beds, a water feature, signs, and three flagpoles."

---

[3] Although Musial referenced Bayberry's "witnesses," it appears that he was only referencing Kuras.

In its discussion of the history of The Homestead, the trial court noted that a portion of the property in the immediate vicinity of the entrance to The Homestead from M-22 to South Homestead Road was the subject of litigation in federal court. Specifically, the United States acquired 32.4 acres of land from The Homestead by utilizing its power of eminent domain through a declaration of taking. The trial court summarized the litigation as follows:

> In 1978, a Judgment of Declaration of Taking and Order for possession was issued, which permitted the United States of America, to take by eminent domain, a portion of the Developer's real property which included Homestead Road. On February 16, 1984, an Amended Judgment on Declaration of Taking and Order for Possession was executed. This Amended Judgment provided a perpetual easement for ingress and easement to The Homestead property and a perpetual easement for a Maintenance Area "to facilitate the visibility of the intersection of Homestead Road and State Highway M-22." The Maintenance Area easement (also referred to as the "National Lakeshore Easement") gave the Developer the rights and responsibilities for clearing, grading, seeding, planting, installing signage, installing lighting, sprinkling, and improving, replacing, repairing and maintaining the easement property. Moreover, while the Amended Judgment gave the Developer the exclusive right and responsibility to maintain the easements, it indicated that apportioning the cost of such maintenance to the beneficiaries of the easements was permissible. [Footnote omitted.]

At trial, it was acknowledged that defendants' condominium projects were established long before the federal court judgment was entered. Importantly, Kuras testified that *he* held "[s]everal easements" to the National Lakeshore Area. Kuras acknowledged that he had "allowed everyone who owns property or is a guest at The Homestead to use that easement to access the[] property." However, because Kuras was unaware of an easement being granted to defendants, we fail to see how *Bowen* would obligate defendants to pay for maintenance of the National Lakeshore Area. Indeed, *Bowen* requires "[t]he maintenance costs of *an easement* used jointly by both the dominant and servient owners are to be paid in proportion to each party's use." *Bowen*, 217 Mich App at 194 (emphasis added). Because evidence establishes that only Kuras holds the easement, we conclude that Bayberry's argument that defendants are obligated under *Bowen* to pay for maintenance with respect to the National Lakeshore Area is without merit.

### 3. DAMAGES AWARD

Finally, Bayberry argues that the trial court erred by failing to award past damages based on its erroneous conclusion that the doctrine of waiver and defense of laches applied. However, our review of the trial court's opinion and order supports that the trial court only hypothetically applied the doctrine of waiver to Bayberry's breach of contract claim and then concluded that "the doctrine of laches is applicable in this case based on the 30-plus year delay in bringing this litigation." Thereafter, the trial court concluded that Bayberry was only entitled to "future expenses" for the maintenance of the South Homestead Road easement. Thus, the trial court applied the doctrine of laches to Bayberry's common law claim.

"Laches is an affirmative defense based primarily on circumstances that render it inequitable to grant relief to a dilatory plaintiff." *Attorney General v PowerPick Club*, 287 Mich App 13, 51; 783 NW2d 515 (2010). The doctrine of laches arose from the requirement that a complainant in equity must come to the court with a clean conscience, in good faith, and after acting with reasonable diligence. *Knight v Northpointe Bank*, 300 Mich App 109, 114; 832 NW2d 439 (2013). "If a plaintiff has not exercised reasonable diligence in vindicating his or her rights, a court sitting in equity may withhold relief on the ground that the plaintiff is chargeable with laches." *Id*. Although timing is important, laches is not triggered by the passage of time alone; rather, it is the prejudice occasioned by the delay that justifies application of the doctrine to bar a claim. *Id*. at 114-115. The defendant bears the burden of proving that the plaintiff's lack of diligence prejudiced the defendant sufficiently to warrant application of the doctrine of laches. See *Yankee Springs Twp v Fox*, 264 Mich App 604, 612; 692 NW2d 728 (2004).

In their affirmative defenses, defendants asserted that the doctrine of laches barred Bayberry's claims because Bayberry (and its predecessors in interest) failed to request any cost-sharing payments for more than 35 years following the creation and recording of the condominium documents. In its opinion and order, the trial court concluded as follows:

> The Court additionally finds that the doctrine of laches is applicable in this case based on the 30-plus year delay in bringing this litigation. The doctrine of laches is a tool of equity that may remedy the general inconvenience resulting from delay in the assertion of a legal right which is practicable to assert. It is applicable in cases in which there is an unexcused or unexplained delay in commencing an action and a corresponding change of material condition that results in prejudice to a party. When laches appears, the court merely leaves the parties where it finds them because equity will not lend aid to those who are not diligent in protecting their own rights. [Citations omitted.]

Thus, the trial court's analysis, which is contained in a footnote in its opinion and order, does not make findings of fact as to how defendants were prejudiced by "the 30-plus year delay in bringing th[e] litigation." We have explained:

> The doctrine of laches is triggered by the plaintiff's failure to do something that should have been done under the circumstances or failure to claim or enforce a right at the proper time .... The defense, to be raised properly, must be accompanied by a finding that the delay caused some prejudice to the party asserting laches and that it would be inequitable to ignore the prejudice so created. The defendant bears the burden of proving this resultant prejudice. [*PowerPick Club*, 287 Mich App at 51 (quotation marks and citations omitted).]

Because the trial court failed to make "a finding that the delay caused some prejudice to [defendants] and that it would be inequitable to ignore the prejudice so created" and because such a finding was necessary before the trial court could conclude that the defense of laches applied, the trial court erred by applying laches. We therefore vacate the portion of the trial court's opinion and order concerning its conclusion that the defense of laches applies and remand to the trial court so that it may make factual findings concerning prejudice.

-13-

Bayberry also argues that the trial court failed to explain why "the remedy in this case is not effective as of the date of the filing of this action." Given that we must vacate the trial court's decision with respect to allocations of costs and the defense of laches for the reasons already discussed, the parties may address this issue in the trial court on remand.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Thomas C. Cameron
/s/ Christopher M. Murray
/s/ Mark J. Cavanagh