*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARK FANNON and KATHERINE FANNON,

Plaintiffs-Appellees,

v

MICHAEL LUTZ, M.D. and MICHIGAN
INSTITUTE OF UROLOGY, PC,

Defendants-Appellants.

UNPUBLISHED
July 29, 2021

No. 350637
Oakland Circuit Court
LC No. 2017-161832-NH

Before: GADOLA, P.J., and JANSEN and O'BRIEN, JJ.

PER CURIAM.

Defendants, Michael Lutz, M.D. and Michigan Institute of Urology, PC, appeal as on leave granted the order of the trial court denying their motion for summary disposition under MCR 2.116(C)(10) of the complaint filed by plaintiffs, Mark and Katherine Fannon, alleging medical malpractice. We reverse and remand to the trial court for entry of judgment in favor of defendants.

## I. FACTS

This case arises from plaintiffs' claim that defendant Lutz negligently failed to diagnose and advise plaintiff Mark Fannon (plaintiff) that he was suffering from prostate cancer. In November 2014, plaintiff's primary physician referred him to endocrinologist Andrew Scrogin, M.D., for an endocrinology workup in response to plaintiff's complaints of low libido, fatigue, and potential low testosterone levels. Scrogin recommended that plaintiff be evaluated by a urologist to rule out prostate cancer before undergoing testosterone replacement therapy (TRT). On November 17, 2014, defendant urologist Lutz, practicing with defendant Michigan Institute of Urology, PC, examined plaintiff and determined that he did not have prostate cancer. As part of the examination, Lutz tested plaintiff's prostate specific antigen (PSA)[1] level, which at that time

---

[1] Prostate specific antigen (PSA) is a protein produced by cells of the prostate gland. The blood level of PSA is often elevated in men with prostate cancer, but elevated PSA levels can also be

was 4.68. Six months earlier, plaintiff's PSA was measured at 2.45.[2] Lutz did not perform a biopsy or an ultrasound to further investigate the cause of the elevated PSA. Plaintiffs allege that Lutz then inaccurately reported to Scrogin that plaintiff's PSA level on November 17, 2014 was 2.45.

Having received assurance from Lutz that he did not have prostate cancer, plaintiff underwent TRT. Plaintiff saw Lutz for a follow-up appointment on May 18, 2015, at which time plaintiff's PSA had increased to 11.47. Lutz did not perform a biopsy and allegedly did not inform Scrogin of plaintiff's PSA level. Instead, Lutz determined that plaintiff had an infection and prescribed antibiotics. On August 25, 2015, plaintiff again saw Lutz for an appointment and his PSA was measured at 16.33. Lutz performed a biopsy, and 10 of the 13 samples taken tested positive for cancer. Plaintiff thereafter underwent surgery and radiation, and was diagnosed with Stage 4 metastatic adenocarcinoma. In 2016, the cancer had spread to certain lymph nodes; as of this appeal, plaintiff remained on long-term experimental cancer therapy.

Plaintiffs filed this lawsuit alleging that Lutz failed to perform an appropriate clinical workup and failed to properly assess plaintiff's laboratory tests in November 2014. Specifically, plaintiffs alleged that upon learning that plaintiff's PSA was 4.68, Lutz should have performed a prostate biopsy, should have ordered an ultrasound or other imaging, and should have consulted with Scrogin regarding plaintiff's PSA of 4.68. Plaintiffs further alleged that plaintiff should not have undergone TRT with a PSA higher than 3, but that Lutz failed to consider that standard. Plaintiffs also alleged that Lutz should have performed a biopsy at the May 2015 follow-up appointment when plaintiff's PSA was 11.47, and should have recognized the indications of advanced cancer requiring aggressive treatment. Plaintiffs alleged that as a result of Lutz's failure to diagnose plaintiff's prostate cancer, plaintiff underwent the contraindicated TRT, and as a result plaintiff's cancer became metastatic within one year of the November 2014 PSA test. Plaintiffs also alleged that defendant Michigan Institute of Urology is liable for Lutz's negligent acts and omissions. Plaintiff Katherine Fannon claimed loss of consortium against both defendants.

Plaintiffs supported their complaint with the affidavit of merit of urologist Christian Pavlovich, M.D., in which Pavlovich stated that Lutz failed to properly identify, treat, and monitor plaintiff's potential prostate issues in light of the referral to Lutz for evaluation in anticipation of TRT therapy, and in light of plaintiff's elevated PSA levels. Specifically, Pavlovich asserted in his affidavit that Lutz had breached the standard of care by failing to appreciate the import of the November 2014 PSA results given that AUA guidelines supported prostate biopsy at PSA levels of greater than 3 or 4, by failing at that time to perform a biopsy or imaging, by failing to consult with Scrogin regarding the PSA results to determine whether plaintiff should undergo TRT, by not

---

caused by benign prostate conditions such as prostatitis (inflammation of the prostate) and benign prostatic hyperplasia (enlargement of the prostate). National Cancer Institute, Prostate-Specific Antigen (PSA) Test (updated February 24, 2021), available at <https://cancer.gov/types/prostate/psa-fact-sheet> (accessed June 23, 2021).

[2] Previous evaluations recorded plaintiff's PSA level in March 2011 at 2.3; in September 2011 at 2.23; in December 2011 at 2.2; in April 2012 at 4.64; in April 2013 at 2.61; and in May 2014 at 2.45.

performing a biopsy in May 2015 when plaintiff's PSA reached 11.77, by delaying diagnosis another 3 months using antibiotic therapy, and by allowing plaintiff's cancer to progress from a statistically curable disease to a disease in an incurable state requiring more advanced and prolonged therapies. With respect to causation, the affidavit asserted that as a result of Lutz's failures, plaintiff did not receive a timely, adequate diagnosis of prostate cancer at the point when it likely was statistically curable, and that within a reasonable degree of medical certainty as well as statistically, if Lutz had performed an appropriate exam and biopsy in November 2014 the cancer would have been diagnosed and confined. In addition, the affidavit asserted that if Lutz had conveyed the correct PSA score of 4.68 to Dr. Scrogin in November 2014, plaintiff may not have undergone TRT.

Thereafter, Pavlovich was deposed. When asked if there was specific literature to support that TRT makes prostate cancer more or less likely, Pavlovich testified:

> No, you would have to go to sort of case reports of men on testosterone that were found to have aggressive cancer. And there are certainly a lot of men who go on testosterone therapy, their PSA goes up, and they're biopsied and they're found to have cancer. Again, that doesn't say that testosterone caused it. It just says that it sort of maybe unmasked it.

When asked about any literature that supports that TRT exacerbates prostate cancer, Pavlovich testified, in relevant part:

> Again, that is, most of us don't think testosterone replacement causes prostate cancer. It is getting a little more difficult to follow whether testosterone replacement exacerbates prostate cancer. And we don't think it exacerbates sort of low grade cancer. And there's not enough data to say for sure whether it exacerbates more aggressive cancers. So the best we can do is just try to make sure someone doesn't have a bad prostate cancer problem before giving them extra testosterone.

When asked further whether there was literature supporting that position, he responded:

> I can't show you a good study. I mean I'm sure there are tiny, you know, crappy ones. But there's certainly no general sense from the literature and there's no important paper that we cite that shows that.

Pavlovich testified that he would not opine about when plaintiff's cancer started and that estimates of that sort are inaccurate. He further testified that although he had reviewed American Urological Association (AUA) Prostate Biopsy Guidelines and Endocrine Society Guidelines for testosterone replacement, he did not plan to support his opinion with studies or articles.

When asked if he had standard of care criticisms with respect to Lutz's conduct on November 17, 2014, he responded:

> *A.* Well, I mean again, my contention is, and I think the answer is yes to your question. Is that if in fact he was sent to Dr. Lutz in order to get sort of a urologic evaluation/opinion regarding the safety of proceeding with testosterone

replacement therapy, that's a very specific, you know, query. And the PSA did come back 4.68. And the free PSA did come back at 18 percent. And that gives this patient a risk of prostate cancer, you know, on this piece of paper of 34 percent. And we don't like to start testosterone replacement therapy in men with prostate cancer unless we know is it nonaggressive, is it medium, is it high aggressive, you know. We don't know the safety of that in men with aggressive prostate cancer. I think he needed to investigate and clear the prostate, meaning, you know, biopsy, MRI. Something more than just a finger, we call it a finger wave, or a digital rectal exam. So my, I think that while, in another context a slightly elevated PSA, abnormal, could be followed six months later, if, especially if there was history of, say, of prior elevations or prior prostatitis. In this case, I think it was behooving the doctor to clear the air here because the other interpretation is, my gosh, this guy has had PSA elevations before, the free PSA is kind of low, this may well be a cancer situation here. And we are dealing with a controversial area. And I'm not sure replacing testosterone is safe. And, again, Endocrine Society Guidelines very much spell out how one handles to the endocrinologist referral to the urologist and expect the urologist to clear the air in terms of whether this man has or does not have cancer. I think sending him back just with a risk of 34 percent, he may or may not, you know, roll the dice, was a bit, you know, cavalier.

*Q.* So do you actually -- so the only reason you're concerned about possibly doing a biopsy on November 17, 2014, correct me if I'm wrong, is that he may be having this testosterone replacement therapy?

*A.* Correct.

*Q.* Okay. So --

*A.* Correct. That's right.

*Q.* So [if] he wasn't contemplating testosterone replacement therapy, Dr. Lutz would have complied with the standard of care in telling him let's come back in six months and we'll do a repeat PSA?

*A.* Yes.

\* \* \*

*Q.* You told me about your standard of care criticism relative to the November 17, 2014 visit. That's the PSA of 4.68. And that's when the patient comes in and talks about testosterone replacement therapy.

*A.* Yes.

*Q.* Do you have any other standard of care criticisms of Dr. Lutz?

*A.* I have to say that I find that the problem is really having to do with that specific issue, because the rest of the management seems, seems appropriate.

*Q.* Okay.

*A.* In the end one can, can look back and say, my gosh, you know, he may well have had prostate cancer back in, you know, November 2014, he may have had it earlier. We don't know. And there were perhaps reasons to investigate it then. Some patients would have wanted a biopsy then based on the risks predicted of a PSA of 4.68 and a free PSA of 18 percent. Others might not have. So as long as you keep that patient close to your chest, seeing them back again in six months, repeat the PSA now that it's up, act on it, and then eventually biopsy relatively expeditiously, we're okay.

The problem is kind of that misinformation or however it happened that Dr. Scrogin felt that the PSA was 2, that the urologist said there was no problem, let's go on testosterone, and that, that is inappropriate care.

Regarding causation, Pavlovich testified, in relevant part:

*Q.* . . . you cannot opine on what effect, if any, the testosterone therapy had on Mr. Fannon's prostate cancer, correct?

*A.* Correct.

*Q.* Okay. And do you have any opinions as to whether ordering an earlier biopsy would have made any difference in the treatment or the ultimate outcome? . . . .

*A.* Yeah. It's, we've been hard pressed to show that six month variations in diagnosis really mean anything. We have seen that greater than six month delays in the diagnosis of high risk cancers can impact outcome. But we didn't really have, I don't see this as a, that there was really a suspicion of a high risk problem to, back in November 2014. So I don't think we have significant delay in diagnosis. And nor would I testify to that.

I do think that, again, obviously in retrospect this patient had cancer in November 2014. And, and not knowing the aggressiveness level of it, went on testosterone, which again is against Society guidelines. But I think that, I don't see the delay in the diagnoses as really the violation of care.

*Q.* All right. Or affecting the treatment or the outcome, fair?

*A.* Probably not, fair.

Defendants moved for summary disposition under MCR 2.116(C)(10), on the basis that there was no genuine issue of material fact that plaintiffs did not establish breach of the standard of care or causation with reliable expert testimony. Defendants contended that plaintiffs' theory that Lutz should have ordered the biopsy prior to plaintiff undergoing TRT was not supported because Pavlovich had conceded that no scientific support exists for the theory that TRT causes or exacerbates prostate cancer. Defendants further asserted that Pavlovich admitted that Lutz did not significantly delay in diagnosing plaintiff's cancer and that an earlier diagnosis would not have

affected plaintiff's treatment or outcome. Plaintiffs responded that Lutz had been tasked with ruling out prostate cancer and had failed to do so because he failed to administer the proper tests and failed to accurately communicate the test results, resulting in a delayed diagnosis of cancer. Plaintiffs contended that they therefore had established a genuine issue of material fact sufficient for submission to a jury. The trial court denied defendants' motion for summary disposition, finding that:

> Plaintiffs have submitted sufficient evidence to establish genuine issues of material fact regarding whether Dr. Lutz breached the applicable standard of care and whether the alleged negligent conduct was both a cause in fact and proximate cause of Plaintiffs' damages. Additionally, the Court finds that Plaintiffs' expert has supported the relevant testimony and adequately meet[s] the reliability requirements of MRE 702 and therefore a *Daubert* Hearing is not necessary.

This Court denied defendants' application for leave to appeal the trial court's order denying their motion for summary disposition. *Fannon v Lutz*, unpublished order of the Court of Appeals, entered December 30, 2019 (Docket No. 350637). Defendants sought leave to appeal to our Supreme Court, which in lieu of granting leave to appeal remanded the case to this Court for consideration as on leave granted. *Fannon v Lutz*, 506 Mich 852 (2020).

## II. DISCUSSION

Defendants contend that the trial court failed to exercise its gatekeeping function to assure the reliability of plaintiffs' expert's opinion testimony before ruling on its admissibility. We agree.

## A. STANDARD OF REVIEW

We review de novo a trial court's decision to grant or deny a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Id*. at 160. Summary disposition under MCR 2.116(C)(10) is warranted when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Id*. When reviewing a motion for summary disposition granted under MCR 2.116(C)(10), this Court considers the documentary evidence submitted by the parties in the light most favorable to the nonmoving party, *id*. at 160, and will find that a genuine issue of material fact exists if "the record leaves open an issue upon which reasonable minds might differ." *Johnson v Vanderkooi*, 502 Mich 751, 761; 918 NW2d 785 (2018) (quotation marks and citations omitted). The moving party has the initial burden to support its motion with documentary evidence, but once met, the burden shifts to the nonmoving party to establish that a genuine issue of material fact exists. *AFSCME v Detroit*, 267 Mich App 255, 261; 704 NW2d 712 (2005).

We review for an abuse of discretion the trial court's decision regarding the qualification of an expert and the admissibility of a witness's testimony, as well as the trial court's decision whether to conduct a *Daubert*[3] hearing. *Lenawee Co v Wagley*, 301 Mich App 134, 161-162; 836

---

[3] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

NW2d 193 (2013). "[A]ny error in the admission or exclusion of evidence will not warrant appellate relief unless refusal to take this action appears . . . inconsistent with substantial justice, or affects a substantial right of the [opposing] party." *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004) (quotation marks and citation omitted).

## B. THE TRIAL COURT AS GATEKEEPER

A claim of medical malpractice arises during the course of a professional medical relationship and hinges upon a question of medical judgment. *Lockwood v Mobile Med Response, Inc*, 293 Mich App 17, 23; 809 NW2d 403 (2011). To establish medical malpractice, the plaintiff must demonstrate "(1) the applicable standard of care, (2) a breach of that standard by the defendant, (3) an injury, and (4) proximate causation between the alleged breach of duty and the injury." *Rock v Crocker*, 499 Mich 247, 255; 884 NW2d 227 (2016).

The standard of care refers to what a professional must do or must not do. *Moning v Alfono*, 400 Mich 425, 437-438; 254 NW2d 759 (1977). The standard of care required of a specialist, here a urologist, is "what the ordinary [urologist] of ordinary learning, judgment or skill would do or would not do under the same or similar circumstances." See *Albro v Drayer*, 303 Mich App 758, 764; 846 NW2d 70 (2014) (quotation marks and citation omitted). A breach of the standard of care is a deviation from that standard. See *Martinez v Redform Comm Hosp*, 148 Mich App 221, 230; 384 NW2d 134 (1986). Ordinarily, expert testimony is required to establish the standard of care and to establish that the defendant breached that standard. *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016). Expert testimony is not required, however, if the defendant's breach of the standard of care is so obvious that it is within the common knowledge and experience of the ordinary layperson. *Id*. at 21-22.

A plaintiff also must demonstrate that his or her alleged injuries were proximately caused by the defendant's breach of the standard of care. See *Rock*, 499 Mich at 255. " 'Proximate cause' is a legal term of art that incorporates both cause in fact and legal (or 'proximate') cause." *Craig*, 471 Mich at 86. A court is required to first determine whether a defendant's negligence was a cause in fact of the plaintiff's injuries before determining whether the defendant's negligence was the legal cause of those injuries. *Ray v Swager*, 501 Mich 52, 64; 903 NW2d 366 (2017).

To establish cause in fact, the plaintiff must present substantial evidence from which the jury could conclude that, more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred. *Weymers v Khera*, 454 Mich 639, 647; 563 NW2d 647 (1997). A plaintiff establishes cause in fact sufficient to create a genuine issue of material fact if the plaintiff establishes "a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support." *Patrick v Turkelson*, 322 Mich App 595, 617; 913 NW2d 369 (2018) (quotation marks and citation omitted). "Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient." *McNeill-Marks v MidMichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016). In a medical malpractice action, expert testimony is required to prove causation. *Kalaj v Kahn*, 295 Mich App 420, 429; 820 NW2d 223 (2012).

The proponent of the expert testimony must establish that the expert is qualified under MCL 600.2169, and also that the opinion is reliable under MRE 702 and MCL 600.2955. See *Elher*, 499 Mich at 22. MRE 702 incorporates the standards for determining the reliability of expert testimony articulated in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), and requires a trial court to determine that each aspect of a proposed expert witness's testimony, including the underlying principles and methodology, is reliable. *Elher*, 499 Mich at 22. That rule provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [MRE 702.]

Our Supreme Court has stated that a lack of supporting medical literature is an important consideration in determining the admissibility of expert witness testimony, although not necessarily dispositive. *Edry v Adelman*, 486 Mich 634, 640; 786 NW2d 567 (2010). Our Supreme Court has also stated that an expert in a medical malpractice lawsuit is expected to justify his or her opinion with authoritative materials supporting the opinion, and that generally, it is not sufficient under MRE 702 to argue that expert testimony is reliable, and therefore admissible, based solely on the expert's experience and background. *Id*. at 642.

In addition to MRE 702, MCL 600.2955 requires the trial court to determine, by examining the expert's opinion and its basis, whether an expert's opinion is reliable and will assist the finder of fact. *Elher*, 499 Mich at 23. The trial court is required to consider the facts, technique, method, and reasoning upon which the expert relied, as follows:

> (1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is **not admissible unless the court determines that the opinion is reliable and will assist the trier of fact**. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and **shall consider all of the following factors**:
>
> (a) Whether the opinion and its basis have been subjected to scientific testing and replication.
>
> (b) Whether the opinion and its basis have been subjected to peer review publication.
>
> (c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.
>
> (d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside the context of litigation. [MCL 600.2955(1) (emphasis added).]

Our Supreme Court has often referred to trial courts as "gatekeepers" regarding expert testimony. As gatekeeper, the trial court is obligated to ensure that expert testimony is both relevant and reliable. *Edry*, 486 Mich at 640. The task of gatekeeping requires the trial court to conduct a "searching inquiry." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 381 (2004). Ultimately, the trial court must rule on the strength of the record presented. See *Edry*, 486 Mich at 640-642. As gatekeeper, the trial court is not required "to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Chapin v A & L Parts, Inc*, 274 Mich App 122, 127; 732 NW2d 578 (2007) (DAVIS, J.). However, the trial court must ensure that admitted expert opinion testimony is derived from a sound foundation. *Id*.

In this case, defendants moved for summary disposition on the basis that the opinion testimony of plaintiffs' sole expert was inadmissible. At the hearing on the motion, the trial court did not ask questions of the parties nor state its reasoning. At the conclusion of the hearing, the trial court took the matter under advisement. The trial court thereafter issued its opinion and order, stating only the following reasoning:

Defendants filed the instant Motion for Summary Disposition. The Court heard oral arguments and took the matter under advisement. After reviewing the Motion, Briefs and Exhibits and having considered the merits and being fully advised in the premises, the Court finds that summary disposition is not appropriate. Plaintiffs have submitted sufficient evidence to establish genuine issues of material fact regarding whether Dr. Lutz breached the applicable standard of care and whether the alleged negligent conduct was both a cause in fact and proximate cause of Plaintiffs' damages. Additionally, the Court finds that Plaintiffs' expert has supported the relevant testimony and adequately meet[s] the reliability requirements of MRE 702 and therefore a *Daubert* Hearing is not necessary.

The record does not demonstrate that the trial court conducted a sufficiently "searching inquiry" under MRE 702 and MCL 600.2955 in arriving at its conclusion, and there is no indication that that the trial court considered the factors set forth in MCL 600.2955(1). Although not all of the statutory factors will be relevant in every case, *Elher*, 499 Mich at 26, our Supreme Court has stated specifically that "[c]onsistent with this [gatekeeper] role, the court 'shall' consider all of the factors listed in MCL 600.2955(1)." *Clerc v Chippewa Co War Mem Hosp*, 477 Mich 1067, 1068 (2007). And although a trial court may exercise its discretion in its role as gatekeeper, the trial court "may neither 'abandon' this obligation nor 'perform the function inadequately.' " *Gilbert*, 470 Mich at 780 (citation omitted).

Trial courts are in the best position to conduct the searching inquiry into the reliability of expert testimony, and this Court will not overturn the trial court's ruling to exclude or admit expert testimony absent an abuse of the trial court's discretion. *Figurski v Trinity Health-Michigan*, 501 Mich 1051, 1053 (2018) (MARKMAN, C.J., dissenting), citing *Craig*, 471 Mich at 76. In this case, however, the record does not indicate a sufficiently searching inquiry under MRE 702 and MCL 600.2955, and thus the trial court inadequately performed its gatekeeping role.

We further conclude that the trial court abused its discretion by finding both the standard of care and causation opinions of plaintiff's expert to be reliable. Pavlovich did not provide literature on the issue whether TRT causes or exacerbates cancer, or on the issue whether the delay in diagnosing plaintiff's cancer affected his treatment or his chances for recovery. The expertise, experience, and knowledge of Pavlovich are not sufficient to render his unsupported expert opinion reliable. See *Edry*, 486 Mich at 642. Moreover, Pavlovich's testimony itself did not provide support for plaintiff's claim. Pavlovich testified that ordering an earlier biopsy would not have made a difference in plaintiff's treatment or recovery. He further testified that his only criticism regarding whether Lutz complied with the standard of care was that plaintiff was contemplating TRT at the time he sought Lutz's opinion. He then testified that it is uncertain whether TRT exacerbates cancer. In light of the absence of admissible expert testimony to support plaintiffs' malpractice claim, defendants are entitled to summary disposition under MCR 2.116(C)(10).

We reverse the order of the trial court and remand to the trial court for entry of judgment in favor of defendants. We do not retain jurisdiction.


/s/ Michael F. Gadola
/s/ Kathleen Jansen
/s/ Colleen A. O'Brien

-10-